OPINION OF THE COURT
 

 Bellacosa, J.
 

 As another building block in our common-law judicial process, this court recognizes the "Housing Merchant” warranty, imposing by legal implication a contractual liability on a homebuilder for skillful performance and quality of a newly constructed home the defendant builder contracted for and sold to plaintiffs. The doctrine that the buyer must beware (caveat emptor) may not be invoked in these circumstances by the appellant-defendant builder-seller against the plaintiffs purchasers, whose affirmed award of damages after a nonjury trial should also be upheld by our court.
 

 On November 29, 1976, plaintiffs Mary and Thomas Caceci entered into a contract with defendant Di Canio Construction Corp. for the sale and conveyance of a parcel of land in Suffolk County on which a one-family ranch home was to be constructed by the defendant builder. The contract price was $55,000. Di Canio guaranteed "for one year from title closing, the plumbing, heating, and electrical work, roof and basement walls against seepage and defective workmanship,” but added that "[liability under this guarantee shall be limited to replacement or repair of any defects or defective parts.” The contract also provided that the dwelling "shall be constructed in accordance with the requirements as to materials and workmanship of the Municipality * * * with the requirements of the lending institution which shall make the mortgage loan [and] with the approved plans and specifications.” Paragraph (24) concluded: "It is further agreed that none of the terms hereof except those specifically made to survive title closing shall survive such title closing.”
 

 On October 14, 1977, title closed. Four years later in December 1981, Mary Caceci noticed a dip in the kitchen floor. The condition was brought to defendant’s attention and an attempt to repair the house was made by jacking up the basement ceiling and inserting shims, to close the gap. The area was spackled over and sealed. These repairs did not solve the problem and the floor soon began to dip again. In November 1982, defendant made another attempt to repair the house,
 
 *56
 
 while assuring plaintiff that the cracks and dips were the result of a normal settling process. Unconvinced, plaintiffs hired a firm experienced in structural and concrete repairs to do test borings and analysis of soil samples. The results showed the cause of the sinking foundation was its placement on top of soil composed of deteriorating tree trunks, wood and other biodegradable materials. The repair work to cure the problem, which took seven months, included digging up the entire slab foundation, removing the wood and tree trunks, and pouring a new foundation.
 

 In May 1983, plaintiffs commenced this action, alleging six causes of action. A nonjury trial was held and, prior to the close of proof, the court dismissed three causes of action based on fraud and negligent repair. The claims which went to verdict were based on breach of contract (rejected), negligent construction (upheld) and breach of implied warranty of workmanlike construction (upheld). The trial court noted that photographs and testimony established that defendant, in pouring the original concrete footing and slab, became aware of the substances in the soil and thus breached duties in negligence and in implied warranty. A judgment of $57,466, representing the reasonable cost of correcting defendant’s slipshod performance, was entered in plaintiffs’ favor together with costs and interest from December 1981.
 

 The Appellate Division affirmed solely on the implied warranty theory, confirming that there was sufficient evidence from which the trier of fact could infer that defendant knew the house was being erected on poor soil.
 

 We, too, affirm, holding that there is an implied term in the express contract between the builder-vendor and purchasers that the house to be constructed would be done in a skillful manner free from material defects. Contrary to the view expressed by the lower courts in this case, however, the builder-seller’s knowledge of the defect, however relevant in a fraud claim, is not decisive under this implied contractual warranty theory. Further, the contract’s standard merger clause is of no legal effect in these circumstances of an implied warranty with respect to latent defects. Plaintiffs’ claim based on a breach of implied warranty could only arise at closing of title when the builder-vendor conveyed a house which suffered from latent material defects. To hold, in a case such as this, that the closing itself, the very act which triggers the claim, also served to extinguish it is self-contradictory, illusory and
 
 *57
 
 against public policy. Finally, the contention that Real Property Law § 251 prohibits this "Housing Merchant” warranty by legal implication also is not persuasive, since that statute is expressly limited to deeds of conveyance and has no application to contracts for the construction and sale of new homes.
 

 Traditionally, the doctrine that the buyer must beware (caveat emptor) governed the sale of personal property and real property. The rationale for the judicially created doctrine was an outgrowth of the 19th century political philosophy of laissez-faire; namely, that a "buyer deserved whatever he got if he relied on his own inspection of the merchandise and did not, extract an express warranty from the seller” (Roberts,
 
 The Case of the Unwary Home Buyer: The Housing Merchant Did It,
 
 52 Cornell LQ 835, 836-837). Thus, the law treated express warranty or negligence or fraud as providing a purchaser of chattel or of real property with a surfeit of remedies.
 

 As the industrial revolution roared into the era of mass produced goods, the law governing the sale of personal property started to relax the rigid results of the caveat emptor rule, culminating in the recognition of an implied warranty of merchantability
 
 (see,
 
 Uniform Sales Act § 15, 1 ULA; UCC 2-314, 2-315). This change in attitude as to chattels had little effect upon sales of real property, because prior to World War II there was no corresponding marketing or production transformation in the home construction industry. The post-World War II boom in housing, however, produced a building industry revolution and a growing awareness of the relative helplessness of would-be homeowners in the face of poor or deficient quality.
 

 Since law usually reflects society’s conflicts and developments, it started to catch up to the changes in home building and purchasing practices by bringing fresh and sharp scrutiny to the doctrine of caveat emptor in these circumstances. One commentator even pointed to the irony of a system of law which "offer[ed] greater protection to the purchaser of a seventy-nine cent dog leash than it [did] to the purchaser of a 40,000-dollar house” (Haskell,
 
 The Case for an Implied Warranty of Quality in Sales of Real Property,
 
 53 Geo LJ 633 [1965];
 
 see also,
 
 Roberts,
 
 The Case of the Unwary House Buyer: The Housing Merchant Did It,
 
 52 Cornell LQ 835 [1967]; Rearman,
 
 Caveat Emptor in Sales of Realty
 
 — Recent
 
 Assaults Upon the Rule,
 
 14 Vand L Rev 541 [1961]).
 

 To harmonize the legal inconsistency and to soften the
 
 *58
 
 harsh effect of the caveat emptor doctrine, many jurisdictions recognized an implied warranty of skillful construction in connection with the sale of newly constructed houses.
 
 *
 
 In fact, English courts, the originators of the caveat emptor rule, were the first to qualify it with the recognition of the implied warranty theory
 
 (Miller v Cannon Hill Estates,
 
 [1931] 2 KB 113). Likewise, lower courts of our State have over the last three decades recognized and joined the legal trend. This case presents the first opportunity, however, for this court to address the continued appropriateness of the caveat emptor doctrine in these circumstances.
 

 Our seminal cases are instructive. In
 
 Lutz v Bayberry Huntington
 
 (148 NYS2d 762, 767-768 [1956] [Marcus G. Christ, J.]), plaintiff purchaser sought to recover damages allegedly suffered because the house erected for him by the defendant builder was defective. The court acknowledged for repleading purposes the purchaser’s cause of action based on the theory that there was an implied term in the agreement that the house would be constructed in a good and skillful manner.
 

 Thereafter, in
 
 Staff v Lido Dunes, Inc.
 
 (47 Misc 2d 322 [1965]), then-Justice Bernard S. Meyer, noting the general rule of no implied warranty on the sale of a completed house, nevertheless identified the national trend in dictum that there should be an implied warranty of quality with respect to a house to be or in the process of being constructed. Lower
 
 *59
 
 courts have adhered to the distinction between contracts for the sale of completed houses and contracts for the construction and sale of a new home, holding that an implied warranty of good and skillful construction exists only as to the latter
 
 (see, e.g., Carter v Cain,
 
 112 AD2d 2;
 
 Dolezel v Fialkoff,
 
 2 AD2d 642;
 
 Spano v Perry,
 
 59 Misc 2d 1062;
 
 compare, De Roche v Dame,
 
 75 AD2d 384,
 
 lv dismissed
 
 51 NY2d 821;
 
 Whitman v Lakeside Bldrs. & Developers,
 
 99 AD2d 679;
 
 Dunn v Bloom,
 
 15 AD2d 687;
 
 Centrella v Holland Constr. Corp.,
 
 82 Misc 2d 537).
 

 The justification in cases which have relaxed the doctrine of caveat emptor with respect to homes contracted for sale prior to construction is that the two parties involved in the purchase of such a home generally do not bargain as equals in relation to potential latent defects from faulty performance. When a buyer signs a contract prior to construction of a house, inspection of premises is an impossibility, especially and obviously with respect to latent defects. Thus, the purchaser has no meaningful choice but to rely on the builder-vendor to deliver what was bargained for — a house reasonably fit for the purpose for which it was intended. The builder-vendor, on the other hand, maintains a superior position and is the only one who can prevent the occurrence of major defects. We hold that responsibility and liability in cases such as the instant one should, as a matter of sound contract principles, policy and fairness, be placed on the party best able to prevent and bear the loss.
 

 Defendant argues that departure from the rule of caveat emptor involves far-reaching policy considerations and, therefore, the decision to supplant it or modify it in these circumstances with an implied contractual warranty of skillful construction must be left to the Legislature. The court’s role is not so limited. Defendant fails to appreciate that we are presented with what was in the first instance a court-made rule. Moreover, significant growth in many diverse areas of the law has emerged from this court’s application of the common-law process to developing, changing and even outdated doctrines.
 

 The mid-19th century well-established principle that the original seller of goods was not liable for damages caused by defects in the product with respect to anyone except the immediate purchaser or one in privity to that purchaser
 
 (see, Winterbottom v Wright,
 
 10 Mees & W 109, 152 Eng Rep 402 [1842]), evolved into an almost grudging exception that a
 
 *60
 
 seller could be liable to a third person for negligence in the preparation and sale of an article "imminently dangerous” to human safety
 
 (Thomas v Winchester,
 
 6 NY 397, 408 [1852]). Then, Judge Cardozo, in
 
 MacPherson v Buick Motor Co.
 
 (217 NY 382), significantly extended the class of inherently dangerous articles to anything which becomes dangerous because it was negligently made. The underlying rationale for the extension of the court-made rule was that the manufacturer, by placing a product on the market, assumed responsibility to the ultimate purchaser and user.
 

 Bing v Thunig
 
 (2 NY2d 656) is another example of this court’s preeminent common-law process at work addressing a well-settled court-made rule. Judge Fuld abandoned the "medical act” exception to the respondeat superior doctrine of
 
 Schloendorff v New York Hosp.
 
 (211 NY 125 [1914]), holding in
 
 Bing v Thunig (supra,
 
 at 667): "[t]he rule of nonliability is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing. It should be discarded. To the suggestion that stare decisis compels us to perpetuate it until the legislature acts, a ready answer is at hand. It was intended, not to effect a 'petrifying rigidity,’ but to assure the justice that flows from certainty and stability. If, instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive, and no principle constrains us to follow it.”
 

 Chief Judge Cardozo’s preeminent work The Nature of Judicial Process captures our role best: "If judges have wofully misinterpreted the
 
 mores
 
 of their day, or if the
 
 mores
 
 of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors” (Cardozo, Nature of Judicial Process, at 152;
 
 see also,
 
 at 109-110, 150-152).
 

 These cases and these views are especially apt in the area of contractual relations where it has long been the law in New York that courts will imply a covenant of good faith where the implied terms are consistent with other mutually agreed upon terms
 
 (Wood v Duff-Gordon,
 
 222 NY 88;
 
 see also, Park W. Mgt. Corp. v Mitchell,
 
 47 NY2d 316, 325). Here, the implication that the builder must construct a house free from material defects and in a skillful manner is wholly consistent with the express terms of the contract and with the reasonable expectation of the purchasers. Common sense dictates that the purchasers were entitled to expect, without necessarily ex
 
 *61
 
 pressly stating the obvious in this contract, that the house being purchased was to be a habitable place. The law ought to fulfill that commonsense expectation.
 

 Defendant’s claims with respect to the sufficiency of the evidence, to the exclusion of expert witness proof and to the measure of damages, have been reviewed and are without merit.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Judges Simons, Kaye, Alexander, Titone and Hancock, Jr., concur; Chief Judge Wachtler taking no part.
 

 Order affirmed, with costs.
 

 *
 

 Over 25 States now recognize some form of an implied warranty of habitability or skillful construction in connection with the sale of homes
 
 (see, In re Cochran v Keeton,
 
 287 Ala 439, 252 So 2d 313 [1971];
 
 Richards v Powercraft Homes,
 
 139 Ariz 242, 678 P2d 427 [1984];
 
 Coney v Stewart,
 
 263 Ark 148, 562 SW2d 619 [1978];
 
 Pollard v Saxe & Yolles Dev. Co.,
 
 12 Cal 3d 374, 525 P2d 88 [1974];
 
 Cosmopolitan Homes v Weller,
 
 663 P2d 1041 [Colo 1983];
 
 Greentree Condominium Assn. v RSP Corp.,
 
 36 Conn Sup 160, 415 A2d 248 [1980];
 
 Gable v Silver,
 
 264 So 2d 418 [Fla 1972];
 
 Bethlahmy v Bechtel,
 
 91 Idaho 55, 415 P2d 698 [1966];
 
 Park v Sohn,
 
 89 Ill 2d 453, 433 NE2d 651 [1982];
 
 Theis v Heuer,
 
 264 Ind 1, 280 NE2d 300 [1972];
 
 Kirk v Ridgway,
 
 373 NW2d 491 [Iowa 1985];
 
 Gosselin v Better Homes,
 
 256 A2d 629 [Me 1969];
 
 Weeks v Slavick Bldrs.,
 
 24 Mich App 621, 180 NW2d 503,
 
 affd
 
 384 Mich 257, 181 NW2d 271 [1970];
 
 Allison v Home Sav. Assn.,
 
 643 SW2d 847 [Mo 1982];
 
 Chandler v Madsen,
 
 197 Mont 234, 642 P2d 1028 [1982];
 
 Norton v Burleaud,
 
 115 NH 435, 342 A2d 629 [1975];
 
 McDonald v Mianecki,
 
 79 NJ 275, 398 A2d 1283 [1979];
 
 Earls v Link, Inc.,
 
 38 NC App 204, 247 SE2d 617 [1978];
 
 Yepsen v Burgess,
 
 269 Ore 635, 525 P2d 1019 [1974];
 
 Elderkin v Gaster,
 
 447 Pa 118, 288 A2d 771 [1972];
 
 Rutledge v Dodenhoff,
 
 254 SC 407, 175 SE2d 792 [1970];
 
 Sedlmajer v Jones,
 
 275 NW2d 631 [SD 1979];
 
 Hollen v Leadership Homes,
 
 502 SW2d 837 [Tex 1973];
 
 Bolkum v Staab,
 
 133 Vt 467, 346 A2d 210 [1975];
 
 Klos v Gockel,
 
 87 Wash 2d 567, 554 P2d 1349 [1976];
 
 Tavares v Horstman,
 
 542 P2d 1275 [Wyo 1975]).