**WESTWOOD PHARMACEUTICALS, INC., Plaintiff,**

v.

**NATIONAL FUEL GAS DISTRIBUTION CORPORATION, as Successor in Interest to Iroquois Gas Corporation, Defendant.**

**No. Civ–88–1122C.**

United States District Court,
W.D. New York.

May 21, 1990.

Phillips, Lytle, Hitchcock, Blaine & Huber (Robert E. Glanville, of Counsel), Buffalo, N.Y., for defendant.

CURTIN, District Judge.

## BACKGROUND

Plaintiff Westwood Pharmaceuticals, Inc. ("Westwood"), claims that defendant National Fuel Gas Distribution Corporation ("National Fuel") is liable for Westwood's past and future response costs associated with the release of hazardous substances on a parcel of land in Buffalo, New York, purchased by Westwood from National Fuel's predecessor in interest, Iroquois Gas Corporation ("Iroquois"). Westwood has asserted four causes of action alleging that National Fuel is liable under either the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613 (1986), or the New York State common law of nuisance and unjust enrichment. National Fuel has moved for summary judgment dismissing Westwood's complaint and holding Westwood liable on National Fuel's counterclaims for its past response costs and for any future response costs it may incur. Westwood has moved for partial summary judgment under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for Westwood's past response costs; for declaratory judgment pursuant to CERCLA Sections 107(a) and 113(g)(2), 42 U.S.C. §§ 9607(a), 9613(g)(2), and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), on National Fuel's liability for any future response costs that Westwood may incur; and for summary judgment as to most of the affirmative defenses asserted by National Fuel.[1]

Saperston & Day, P.C. (Daniel M. Darragh, of Counsel), Buffalo, N.Y., for plaintiff.

---

1. Westwood is seeking summary judgment with regard to its CERCLA claim on National Fuel's first (failure to state a claim upon which relief can be granted), second (statutes of limitations), fourth (retroactivity/constitutionality of CERCLA), fifth (acts or omissions of third parties), seventh (claims precluded because site at issue is not a priority site for remedial action), eighth (claims precluded because Westwood's activities were not approved, directed, or certified by state or federal authorities), ninth (lack of ownership of or control over site by National Fuel since 1972), tenth (state-of-the-art methods and industry practice), eleventh (proximate cause/superseding cause), twelfth (laches), fourteenth (adequate remedy at law), sixteenth (caveat emptor), seventeenth (standing for injunctive relief), eighteenth (caveat emptor), nineteenth (due care/foreseeable acts/acts or omissions of third parties), twentieth (estoppel),

## FACTS

The site at issue encompasses approximately 8.8 acres bounded on the west by DeWitt Street, on the south by Bradley Street, on the east by Dart Street, and on the north by land owned by the Buffalo Structural Steel Corporation. The northwest corner of the site is bounded by Scajaquada Creek. It appears that the site has been put to industrial use since 1866. Before the land was purchased by People's Gas Company ("People's"), it was used for operations such as a sawmill, an iron-products manufacturing plant, a carriage and sleigh works, and a carriage-top manufacturing company. When People's bought the land in 1897, it constructed a gas-manufacturing plant. In 1925, Iroquois purchased the site for $375,000, gaining title by a referee's deed, and People's was subsequently dissolved in 1932.

Iroquois conducted gas-manufacturing and storage operations on the site through 1951. According to National Fuel,

> [t]ars and waste oils produced by the Iroquois operations were extracted in concrete tar separator pits and stored in tanks pending sale or off-site disposal.... Spent oxides generated in the gas purification process were taken off-site for disposal.... Ash and cinders were stored on site temporarily and then removed for use or disposal elsewhere.

Item 14 at 4. Iroquois halted gas-manufacturing operations at the site in 1951, but continued to use the location for gas compression and storage for several years thereafter. In 1968, it had certain structures on the premises demolished, primarily, it appears, on the northern portion of the site. The structures that were demolished included a 1.75–million-cubic-foot gas holder, a one-million-gallon oil tank, a relief holder, a gas-purifying house, and at least two tar-separator pits. Other structures on the southern portion of the premises

were left standing. National Fuel states that

> [i]n connection with the demolition, oils, tars, coal, coke, spent oxides, and various wastes from the gas manufacturing process were removed from the site for sale or disposal.... Underground pipelines were purged with an inert gas and plugged.... The tar separator pits were pumped out, the above-ground portions were collapsed into the sub-surface sections ... and were covered with a clay cap.

Item 14 at 5.

In 1972, Westwood, which since at least 1942 had occupied what appears to be an adjacent parcel, purchased the property from Iroquois in order to accommodate its planned expansion; the purchase price was $60,100. The sales contract, which provided that it was to be "governed by and construed in accordance with the laws of the State of New York," Item 13, Affidavit of Robert E. Glanville ("Glanville Affidavit"), Exhibit L at ¶ 14, provided Westwood the right to pre-closing access to the property to

> (a) inspect the Premises upon reasonable notice to the Seller; (b) enter the Premises for purposes of inspection and planning for Purchaser's occupancy and for the demolition of buildings and improvements; and (c) commence the demolition of buildings and improvements situated upon the Premises....

*Id.*, Exhibit L at ¶ 5. Westwood subsequently demolished the remaining structures at the site. According to Westwood, although it was told that "all buildings, tanks, pipelines and other improvements situate [sic] on the premises had been purged of natural gas and other chemicals" used in the business operations on the site, it was never told "of the existence of the partially demolished remains of buildings, process equipment, and waste residues left buried at the premises." Item 16 at 3.[2]

and twenty-first (unclean hands) affirmative defenses.

Although Westwood states that it is also seeking summary judgment with regard to its CERCLA claim on National Fuel's third affirmative defense, *see* Item 16 at 1, that defense (preemp-

tion) applies only to Westwood's state common-law claims.

**2.** The sales contract provides:

> Seller understands that Purchaser intends to demolish the buildings, tanks, pipelines (in-

For its part, National Fuel claims that Iroquois was never told of Westwood's development plans prior to the sale, Item 14 at 6, although it seems unlikely that Iroquois was not aware that construction of some type would be undertaken at the site.

Westwood subsequently constructed a warehouse on the southern portion of the property. Soil borings associated with the construction were taken in 1973, and, according to National Fuel, those borings indicated "widespread petroleum-product contamination of the site." Item 14 at 8. Soil borings were also taken in 1984 and 1985 in connection with the construction of a warehouse on the northern portion of the site,[3] and they revealed petroleum-related contaminants and other wastes. During excavation for the second warehouse, Westwood encountered subsurface pipeline and the remains of three separator pits and a filter bed. According to Westwood, the separator pits were filled with "demolition debris, and a mixture of water, tar, and waste oil"; the filter bed contained "oily contaminated water"; and the pipes contained "various process residues and waste materials." Item 16 at 3–4. In February, 1985, Westwood had a consultant dig a series of test pits on the location of the planned warehouse, and soil samplings from the pits apparently also displayed signs of petroleum-related contamination. See Item 14 at 10.

National Fuel alleges that Westwood continued with construction far too prematurely. It claims that "[n]otwithstanding these repeated and detailed reports of widespread petroleum product contamination of the project area, Westwood did not initiate an investigation into the origin or scope of the contamination." Item 14 at

10. National Fuel also claims that Westwood likewise failed to confer with "its environmental consultants, its architects, its general construction contractor, or anyone else, to determine whether the conditions encountered required action to protect against a release of these substances into the environment." Id. at 10–11. National Fuel asserts that "[o]n numerous occasions" in late 1985 and early 1986 it expressed concern to Westwood about the manner and pace of the construction activities, and that its concern over containing the migration of suspected wastes on or from the site led it to ask Westwood at least to modify those activities. National Fuel states that it reiterated these concerns by letter in February, 1986, see Item 13, Glanville Affidavit, Exhibit D at 41–42; Item 3 at ¶ 42, but that Westwood nonetheless proceeded with construction on an "expedited basis." Item 14 at 14.

In any event, it appears that the clay cap was removed from the site in October, 1985, during the early phases of construction of the second warehouse, and that Westwood subsequently continued with construction activities. The initial phase of construction apparently involved stripping topsoil to a depth of eighteen inches, and, according to National Fuel, it was during this process that the clay cap was removed. See Item 14 at 11. It appears that the separator pits were initially discovered by Westwood in approximately November, 1985.

Westwood states that, after submitting the materials it discovered at the site for chemical analysis, it contracted for the removal of the contaminated soil and the waste matter "in a manner which was consistent with the applicable waste manage-

cluding those above and beneath the surface of the ground) and other improvements situated on the Premises. Such demolition will require the use of cutting torches and other tools and equipment which may produce flame, heat or sparks. Seller represents and warrants that all buildings, tanks, pipelines (both above and beneath the surface of the ground) and other improvements situated on the Premises have been purged (with an inert gas) of natural gas and other chemicals used by Seller in connection with its business. The Seller has advised Purchaser and Purchaser's

demolition contractor that any such purging may, nevertheless, leave residual amounts of natural gas and other chemicals which would require use of due care and constant testing and surveillance if cutting tools, cutting torches and other tools and equipment which may produce flame, heat or sparks are used during demolition.
Item 13, Glanville Affidavit, Exhibit L at ¶ 11.

3. The warehouse is referred to by the parties as building "No. 9" or "Building 9."

ment regulations of the New York Environmental Conservation Law." Item 16 at 4. Westwood also states that, subject to review and comment by the New York State Department of Environmental Conservation ("DEC"), it initiated procedures designed to investigate the extent of soil and groundwater contamination at the site that included "the installation, sampling and analysis of groundwater monitoring wells, in a manner which is consistent with the provisions of the National Contingency Plan." *Id.* It is not clear, however, precisely when these actions were taken.

Westwood asserts that "[t]he investigations conducted to date have established the existence of a release of hazardous substances at the Premises and have confirmed that the hazardous substances found at the site are constituents of the wastes and by-products from the gas manufacturing operations conducted there by [Iroquois]." Item 16 at 4–5. Westwood states that it has thus far incurred over $650,000 in costs associated with the investigation and cleanup of the site, and that it expects to incur additional costs. National Fuel asserts that it has spent over $75,000 in costs associated with its own investigation of the site that was required by Westwood's construction activities.

## DISCUSSION

■ The standards for adjudication of a motion for summary judgment are well settled. In order to prevail, the moving party must demonstrate "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). *See generally Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). A material fact is one "that might affect the outcome of the suit under the governing law ... [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact will be considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court

"must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion," *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), and "[u]ncertainty as to the true state of any material fact defeats the motion." *United States v. One Tintoretto Painting,* 691 F.2d 603, 606 (2d Cir. 1982) (citation omitted). *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986); *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

## I. *National Fuel's Motion for Summary Judgment*

### a) Disposal

■ National Fuel claims that it is not liable under CERCLA, arguing that depositing hazardous substances into concrete or steel structures covered by a clay cap does not constitute "disposal" within the meaning of CERCLA, and, therefore, that it did not own or operate the site at the time any such hazardous substances were disposed of as required for liability under Section 107(a) of CERCLA. Item 14 at 19–21. Referring to the hazardous substances at the site as having been "haphazardly abandoned" by National Fuel, Westwood responds that National Fuel's "disposal practices" made release of the toxins into the environment "inevitable," charging that, in addition to the tar-separator pits, National Fuel left waste materials and "process residues" in pipelines, in a filter bed, and within some concrete foundations. Item 19 at 3. Westwood claims that National Fuel has failed to produce "any substantiating evidence to the effect that it removed these hazardous substances or made any attempt to secure or contain them," *id.,* and contends that National Fuel's actions in placing the wastes into the environment constituted disposal within the meaning of CERCLA. *See* Item 19 at 1–4.

Section 107(a)(2) of CERCLA authorizes the recovery of response costs from "any

person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" if "there is a release, or a threatened release ... of a hazardous substance" from the facility. 42 U.S.C.A. § 9607(a)(2) (Supp.1989); *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 & n. 16 (2d Cir.1985). *See also id.* at 1044 n. 18. Section 101(29) defines "disposal" as

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such ... waste or any constituent thereof *may* enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C.A. § 9601(29) (Supp.1989) (emphasis added) (incorporating the definition contained in 42 U.S.C. § 6903(3)).

■ To begin, assuming *arguendo* that the structural integrity of the subsurface receptacles placed or otherwise used at the site by Iroquois would not have been breached and, therefore, hazardous substances would not have escaped but for the construction activities of Westwood, the court holds that, contrary to the assertion by National Fuel, depositing hazardous substances into such receptacles nonetheless constituted "disposal" within the meaning of CERCLA. *See Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784, 791–92 (D.N.J.1989); *State of New York v. General Electric Co.*, 592 F.Supp. 291, 296 (N.D.N.Y.1984). *See also* 42 U.S.C. § 9601(9). Assuming that Iroquois did, in fact, deposit hazardous substances into the various underground pipes and structures, and further assuming that Iroquois did not remove all such substances before relinquishing the site to Westwood, that those materials were deposited so that they "may enter the environment ..." is evident from the fact that they *did* enter the environment. That they may have done so only because of the actions of a third party—in this case, Westwood—is irrelevant for the purpose of determining whether they were "disposed of" by Iroquois within the meaning of CERC-

LA. Rather, the issue of whether Westwood is solely responsible for allowing hazardous substances to escape from the subsurface receptacles abandoned at the site is relevant to whether National Fuel can sustain the defense it has asserted pursuant to Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3)—namely, that any release or threatened release of hazardous substances and any damages resulting therefrom were caused solely by Westwood. Put another way, CERCLA does not provide a third-party defense for a party claiming that it did not "dispose of" a hazardous substance under Section 101(29) comparable to the third-party defense provided in Section 107(b)(3). Of course, with regard to the ultimate issue of liability under CERCLA, a party who disposes of hazardous substances in receptacles whose structural integrity has not been violated is free to argue that there has not been a release or a threatened release of such materials into the environment.

In any event, National Fuel has not established that, prior to Westwood's construction activities, the subsurface receptacles left at the site were as secure as it claims. Much of National Fuel's argument regarding its potential liability under CERCLA is premised on the assumption that any hazardous materials that were not removed for off-site use or disposal by Iroquois did not escape from the various subsurface pipes and structures left at the site until Westwood breached the structural integrity of those receptacles during its construction activities. For example, National Fuel claims that the "below grade" portions of the tar-separator pits and the abandoned pipes "remained intact" after demolition was completed by Iroquois. *See* Item 14 at 5 n. 2. The deposition testimony cited by National Fuel in support of this assertion, however, is not nearly so conclusive. With regard to the separator pits, the deposition transcript cited by National Fuel merely indicates that "visually they *looked like* they were intact." Item 13, Exhibit F at 72 (emphasis added). With regard to the pipes, the cited portion of the transcript only indicates that the witness

"didn't see holes in them. Other than the holes we made trying to get them out. And I can't remember if they just terminated somewhere in the ground or where they went to. They probably were connected to something else, but I just don't remember." *Id.* at 138–39. This evidence clearly offers too tenuous a foundation upon which to base granting summary judgment in favor of National Fuel, particularly in light of the fact that National Fuel is relying on witnesses who do not have personal knowledge of Iroquois's disposal practices.

Moreover, National Fuel, at least for present procedural purposes, does not dispute that hazardous substances were found in the subsurface receptacles; rather, it contends that such substances must have migrated into the structures from the surrounding soil and water. But, as Westwood points out, if hazardous materials could get into these containers, they could also get out of them. *See* Item 36 at 38–39. Thus, there is a reasonable basis to suspect that the structures were not as secure as portrayed by National Fuel. Westwood has thus produced sufficient evidence to raise a jury question as to whether any hazardous substances disposed of at the site by Iroquois caused Westwood to incur response costs due to the release or threatened release of those substances.[4]

Furthermore, the extent to which Iroquois, prior to the conveyance to Westwood, removed any hazardous substances that it had disposed of at the site remains unclear. Indeed, to hold otherwise the court would have to assume that Iroquois handled and removed hazardous substances at and from the site over its nearly half-century of ownership with proficiency rivaling contemporary state-of-the-art techniques. Even National Fuel's own environmental consultant supports the conclusion that Iroquois may have left hazardous substances at the site in more than trace amounts. As stated by a hydrogeologist employed by the consultant:

> I conclude that it is highly probable that the chemicals detected in the groundwater monitoring wells on the site since 1985 originated either from wastes not produced by Iroquois operations *or from the disruption of the integrity of the enclosures containing such residual materials and their cover materials* by Westwood's construction activities during and after November, 1985.

Item 13, Affidavit of Hussein Aldis at ¶ 10 (emphasis added).[5] The quantity of the so-called "residual materials" admittedly left at the site thus remains unclear. While Westwood may be overstating the extent to which it thus far has established that hazardous substances found at the site had their origins in the gas-manufacturing operations conducted there by Iroquois, contrary to the suggestion by National Fuel, *see* Item 23 at 10–13, Westwood need not establish that the wastes could *only* have been produced by Iroquois in order to withstand the present motion for summary judgment. *Cf. United States v. Monsanto Co.,* 858 F.2d 160, 169–71 (4th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *United States v. Wade,* 577 F.Supp. 1326, 1332–34 (E.D.Pa. 1983).

In short, in light of the record presently before the court, sufficient material factual issues remain to preclude summary judgment for National Fuel on the issue of whether it is liable under CERCLA.

### b) Subject–Matter Jurisdiction

█ National Fuel also argues that Westwood's state-law claims should be dismissed for lack of subject-matter jurisdic-

---

**4.** The court also notes that a filter basin was installed at the site in 1947 by Iroquois, and that National Fuel has acknowledged that "[n]o records indicate that either Iroquois or National Fuel removed that filter basin or its contents from the premises." Item 13, Glanville Affidavit, Exhibit D at 9; Item 15 Affidavit of Daniel M. Darragh, Exhibit B at 9. It is presently unclear whether Westwood is alleging that hazardous substances escaped from the basin, or whether the basin and its contents have otherwise contributed to Westwood's response costs.

**5.** The court notes that this affidavit refutes National Fuel's claim that "[t]here is *no* proof in this case that any wastes produced by National Fuel's operations were disposed of or remained on the site." *See* Item 30 at 3 (emphasis added).

tion. Item 14 at 27–29. It is clear, however, that Westwood's federal claims and its state common-law claims "derive from a common nucleus of operative fact," and that, "considered without regard to their federal or state character, [the] plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). *See also State of New York v. Shore Realty Corp.*, 759 F.2d at 1050. As there does not appear to be any sufficiently compelling reason for the court not to exercise its discretionary jurisdiction over the pendent state-law claims, National Fuel's motion to dismiss those claims for lack of subject-matter jurisdiction is denied.

c) Caveat Empter

i. *Westwood's CERCLA Claim*

■ National Fuel also argues that Westwood's CERCLA claim is barred by the New York State common-law doctrine of caveat emptor. National Fuel argues that the extremely low contract price "presumably" reflected the parties' understanding that, under New York law, National Fuel would not be liable to Westwood for any condition of the property. Item 14 at 22–26. The United States Court of Appeals for the Third Circuit, however, rejected such an argument in *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989), and the court finds the analysis done by the Third Circuit to be persuasive.[6] Accepting National Fuel's position clearly would be inconsistent with Congress's intent, in enacting CERCLA, to provide for swift clean-up of hazardous substances by all responsible parties under a uniform national scheme. *See also In re Acushnet River & New Bedford Harbor*, 712 F.Supp. 1010, 1013–14 (D.Mass.1989); *United States v. Hooker Chemicals & Plastics Corp.*, 680 F.Supp. 546, 556–57 (W.D.N.Y. 1988). Consequently, the court holds that Westwood's CERCLA claim is not barred by the doctrine of caveat emptor.

The court also notes the fundamental unfairness of National Fuel's argument. While National Fuel properly argues that, under New York law, the doctrine of caveat emptor bars Westwood's private-nuisance claim, *see infra* at subsection "iii," it is difficult to understand how National Fuel can argue that Westwood also bargained-away National Fuel's CERCLA liability in light of the fact that that statutory scheme was passed approximately eight years after the site at issue was conveyed to Westwood. Rather, logic and fairness dictate that, barring appropriate contractual language amply indicating otherwise, Westwood bargained away National Fuel's future liability only insofar as National Fuel's liability was shaped by the legal principles operative at the time of the conveyance. In other words, while Westwood may have bargained-away its ability to bring an action based on private nuisance against National Fuel in light of then-established New York common-law principles, it did not relinquish its right to bring an action based on statutes such as CERCLA and SARA that were not in existence at the time of the conveyance. The soundness of this result is buttressed by the fact that it furthers the compelling congressional goal underlying the enactment of these statutes—"respon[ding] to the severe environmental and public health effects posed by the disposal of hazardous wastes." *United States v. Hooker Chemicals & Plastics Corp.*, 680 F.Supp. at 548.

The case upon which National Fuel primarily relies, *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454 (9th Cir.1986), does not hold otherwise. In finding that a successor landowner had contracted away any claim it might have had under CERCLA, the district court in that case noted that the purchaser had at least constructive knowledge of any such potential claim because CERCLA had been in existence for nearly a year at the time the settlement agreement and release at issue were executed. *Mardan Corp. v. C.G.C. Music, Ltd.*, 600

6. The Second Circuit has yet to address the issue.

F.Supp. 1049, 1057 (D.Ariz.1984). That factor was specifically cited by the Ninth Circuit in affirming the district court's decision. 804 F.2d at 1463.

ii. *Westwood's Public–Nuisance Claim*

■ National Fuel also contends that the doctrine of caveat emptor deprives Westwood of standing to maintain a public-nuisance action. Item 14 at 35–36. In support of its argument, National Fuel cites *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 315–16 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985), a case in which the Third Circuit determined that Pennsylvania law did not provide a landowner with a cause of action based on public nuisance against the corporate successor of the vendor from whom the landowner had originally purchased the property.

New York law, however, supports Westwood's claim of standing. In *Copart Industries, Inc. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977), the New York Court of Appeals defined public nuisance as "conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all … in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Id.* at 172, 362 N.E.2d at 791 (citations omitted). In order for a private party to maintain an action for public nuisance, "the harm suffered must be 'of a different kind from that suffered by other persons exercising the same public right.'" *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 464 N.Y.S.2d 712, 721, 451 N.E.2d 459, 468 (1983) (quoting RESTATEMENT (SECOND) OF TORTS § 821C comment b (1977)).

With regard to the issue of what constitutes a public nuisance under state law, the Second Circuit has held that "the release or threat of release of hazardous waste into the environment unreasonably infringes upon a public right and thus *is a public nuisance as a matter of New York law.*"

*State of New York v. Shore Realty Corp.*, 759 F.2d at 1051 (citations omitted) (emphasis added). *See also United States v. Hooker Chemicals & Plastics Corp.*, 722 F.Supp. 960, 965 (W.D.N.Y.1989); *United States v. Hooker Chemicals & Plastics Corp.*, 118 F.R.D. 321, 324 (W.D.N.Y.1987). Westwood has provided evidence that at least some of the materials found on the premises were hazardous substances associated with Iroquois's gas-manufacturing and storage operations. Consequently, resolving all ambiguities and drawing all reasonable inferences in its favor, Westwood has provided sufficient evidence for a reasonable jury to conclude that National Fuel is responsible for the release or threatened release of hazardous waste into the environment.

With regard to the issue of whether Westwood has suffered harm "of a different kind from that suffered by other persons exercising the same public right," the court finds that if Westwood can establish, as it claims, that it has incurred response costs consistent with the National Contingency Plan ("NCP"), *see* 42 U.S.C. §§ 9601(31), 9607(a), those costs will be sufficient to meet this criterion for bringing a public-nuisance action. *See* RESTATEMENT (SECOND) OF TORTS § 821C comment h (1977); *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d at 316.

The court thus rejects National Fuel's argument that Westwood's public-nuisance claim is barred because, according to National Fuel, Westwood had an adequate opportunity between 1972 and 1985 to investigate the site and to remove any alleged nuisance. *See* Item 14 at 37–41. All the cases cited by National Fuel—*Pharm v. Lituchy*, 283 N.Y. 130, 27 N.E.2d 811 (1940); *New York Telephone Co. v. Mobil Oil Corp.*, 99 A.D.2d 185, 473 N.Y.S.2d 172 (1st Dep't 1984); *Rufo v. South Brooklyn Savings Bank*, 268 A.D. 1057, 52 N.Y.S.2d 469 (2d Dep't 1945), *appeal dismissed*, 295 N.Y. 981, 68 N.E.2d 60 (1946); *Zeledon v. Bowery Savings Bank*, 195 Misc. 933, 85 N.Y.S.2d 414 (1948), *appeal dismissed*, 276 A.D. 898, 95 N.Y.S.2d 345 (1st Dep't 1950); *Tri–Boro Bowling Center, Inc. v.*

*Roosevelt Eighty–Fifth Estates, Inc.*, 77 N.Y.S.2d 74 (N.Y.Sup.Ct.1947)—involve private-nuisance actions, and National Fuel has not suggested why the holdings of those cases should be applied to public-nuisance actions such as the one at bar. In light of the different interests and public-policy concerns involved in public-nuisance actions, the court has not been convinced that New York courts would dismiss Westwood's claim. This conclusion is bolstered by the nature of the alleged public nuisance involved here—contamination of the environment by hazardous substances. Knowledge about the hazards to public health and to the environment posed by hazardous wastes is increasing constantly, and this court is not willing to assume that the New York law of public nuisance is too inflexible to meet the growing public need for avenues to address these hazards, including lawsuits where public interests are being protected through a cause of action brought by a private party.

### iii. *Westwood's Private–Nuisance Claim*

 National Fuel also contends that the doctrine of caveat emptor bars Westwood's common-law private-nuisance claim. Item 14 at 30–41. Westwood replies that under New York law there is no such bar to its claim, arguing that the New York doctrine against alienation of nuisances should be applied to "override" this defense. Item 19 at 9–17.[7]

 The general rule under New York law is that the sale of real property is governed by the doctrine of caveat emptor. *See, e.g., Lindlots Realty Corp. v. Suffolk County*, 278 N.Y. 45, 54, 15 N.E.2d 393 (1938); *London v. Courduff*, 141 A.D.2d 803, 529 N.Y.S.2d 874, 875 (2d Dep't), *lv. to appeal denied*, 73 N.Y.2d 809, 537 N.Y.S.2d 494, 534 N.E.2d 332 (1988); *De Roche v. Dame*, 75 A.D.2d 384, 430 N.Y.S.2d 390,

392 (3rd Dep't), *lv. to appeal denied*, 51 N.Y.2d 821, 433 N.Y.S.2d 427, 413 N.E.2d 366 (1980). While the New York Court of Appeals has abolished the defense of caveat emptor in cases involving contracts for the construction and sale of homes, *see Caceci v. Di Canio Construction Corp.*, 72 N.Y.2d 52, 530 N.Y.S.2d 771, 526 N.E.2d 266 (1988), Westwood has provided no convincing reason for this court to assume that the Court of Appeals would likewise refuse to apply the doctrine where, as in the present case, the vendor and the vendee of the property at issue are both sophisticated commercial enterprises who agreed to a purchase price based, apparently in large part, on the condition of the property at the time of conveyance.[8]

Westwood has cited three cases in support of its argument that New York courts would apply the doctrine against alienation of nuisances under these facts, but each is readily distinguishable from the case at bar.

Westwood correctly points out that in *Pharm v. Lituchy* the New York Court of Appeals recognized the principle that a landowner who creates a nuisance cannot escape liability to third persons for injuries caused by the nuisance simply by having sold the property before the injuries were sustained. The court, however, qualified its holding by stating that a vendor's liability "persists beyond conveyance *at least until the new owner has had reasonable opportunity to discover the condition on prompt inspection and to make necessary repairs. . . .* We need not determine its limits more precisely." 283 N.Y. at 132, 27 N.E.2d 811 (emphasis added).

Subsequent case law has reaffirmed that there are limits to a vendor's liability in such cases. For example, in *New York Telephone Co. v. Mobil Oil Corp.*, 99

---

**7.** Westwood concedes that it is asking the court "to extend the scope of private nuisance liability beyond that heretofore recognized" since "traditional private nuisance actions are brought by neighboring landowners rather than successor landowners." Item 19 at 16 n. 7. National Fuel, however, has not challenged Westwood's right to bring a private-nuisance claim on this ground.

**8.** The difficulty of fully ascertaining the understanding of the parties has been exacerbated by the fact that at least three of the people principally involved with the negotiations between Iroquois and Westwood have died or are incapacitated. *See* Item 14 at 6.

A.D.2d 185, 473 N.Y.S.2d 172 (1st Dep't 1984), one of New York's intermediate appellate courts held:

> The owner of land ceases to be liable in negligence for its dangerous condition when the ownership of the premises or possession and control pass to another before the injury is sustained. *Even where a continuing trespass or nuisance exists,* liability of the owner terminates after the conveyance at such time as the new owner has had a reasonable opportunity to discover the condition by making prompt inspection and necessary repairs.

*Id.,* 473 N.Y.S.2d at 174 (emphasis added) (citing *Pharm v. Lituchy* ). The court held that a former gasoline-station owner and its gasoline supplier were not liable in nuisance to an adjoining property owner for damage allegedly caused by leakage from subsurface gasoline tanks that had been installed by the owner and the supplier. In reaching its decision, the court found that the subsequent owner and its lessee [9] had had ample opportunity to discover the nuisance and to make appropriate repairs during the more than nine years that, collectively, they had owned, possessed, and controlled the premises and had conducted operations thereon. 473 N.Y.S.2d at 175.[10] *See also Zeledon v. Bowery Savings Bank,* 195 Misc. 933, 85 N.Y.S.2d 414 (1948), *appeal dismissed,* 276 A.D. 898, 95 N.Y.S.2d 345 (1st Dep't 1950) (six months "more than enough" time to give successor property owner reasonable opportunity to discover and to repair nuisance (defective fire escape), thereby terminating any potential liability of two prior owners to injured party); *Tri–Boro Bowling Center, Inc. v. Roosevelt Eighty–Fifth Estates, Inc.,* 77 N.Y.S.2d 74 (N.Y.Sup.Ct.1947) (former property owner not liable for damages

caused by nuisance (collapsed ceiling) over four years after property was conveyed). *Cf. Rufo v. South Brooklyn Savings Bank,* 268 A.D. 1057, 52 N.Y.S.2d 469 (2d Dep't 1945), *appeal dismissed,* 295 N.Y. 981, 68 N.E.2d 60 (1946) (after verdict indicating that jury had found approximately one month to be sufficient time for successor property owner to discover and to repair nuisance (defective stair tread) that had existed at time property was conveyed, verdict against codefendant prior owner reversed). The court concludes that, whatever the precise limits they might otherwise place on the applicability of the doctrine against alienation of nuisances, New York courts would find on the present record that Westwood had a reasonable opportunity to discover and to take steps to abate the alleged nuisance between 1972 and 1985.

Westwood also cites the New York Court of Appeals' affirmance in *State v. Ole Olsen, Ltd.,* 65 Misc.2d 366, 317 N.Y.S.2d 538 (1971), *aff'd,* 38 A.D.2d 967, 331 N.Y.S.2d 761 (2d Dep't 1972), *after trial,* 76 Misc.2d 796, 352 N.Y.S.2d 97 (1973), *aff'd mem.,* 45 A.D.2d 821, 357 N.Y.S.2d 1016 (2d Dep't 1974), *aff'd as modified,* 35 N.Y.2d 979, 365 N.Y.S.2d 528, 324 N.E.2d 886 (1975), as a recent reaffirmation by that court of the doctrine against alienation of nuisances. Westwood relies on the court's statement that "these defendants had conveyed all their interest in the properties in question to the present homeowners or their predecessors in title several years ago." 35 N.Y.2d 979, 365 N.Y.S.2d at 529, 324 N.E.2d 886. *See* Item 19 at 15.

*Ole Olsen* does not advance Westwood's position for three reasons. First, that case involved a public-nuisance action brought by the State of New York against the

---

**9.** The City of New York had gained title to the property in 1969 by eminent domain, and then leased the gas station to another operator in 1971. The property damage underlying the lawsuit was sustained in 1978. 99 A.D.2d 185, 473 N.Y.S.2d at 173–75.

**10.** The court does not accept National Fuel's characterization that the First Department held "*as a matter of law,* that nine years was an 'ample opportunity to discover the condition

and make the necessary repairs.' " Item 14 at 40 (emphasis supplied) (quoting 99 A.D.2d 185, 473 N.Y.S.2d at 175). Rather, the court held that "[t]he City has had ownership and Ramerez has had operation, possession and control for more than nine years, *with* ample opportunity to discover the condition and make the necessary repairs." 99 A.D.2d 185, 473 N.Y.S.2d at 175 (emphasis added).

developers of a residential tract comprised of individual vacation homes. Second, National Fuel is not challenging the continuing viability of the doctrine against alienation of nuisances; rather, it is arguing that the doctrine does not apply in the present case. Third, while the doctrine against alienation of nuisances was discussed in *Ole Olsen, see* 317 N.Y.S.2d at 541; 331 N.Y.S.2d at 763; 352 N.Y.S.2d at 99–100,[11] Westwood is simply reading too much into the portion of the Court of Appeals' opinion that it cites. That statement was not made in the context of rejecting a defense of caveat emptor. Rather, when read in light of the history of that litigation, it is clear that the statement was made in response to the defendants' claim, maintained from the outset of the lawsuit, that the trial court did not have the power to order remedial relief that required the defendants to enter upon the land of another where the defendants had not reserved any right to reenter at the time of conveyance. *See* 317 N.Y.S.2d at 541–42; 331 N.Y.S.2d at 763. As the Court of Appeals went on to state in its opinion:

> Problems of fashioning remedial relief other than by way of damage against these defendants who no longer hold any interest in the properties, have been obviated in this case. All presently affected homeowners have been made parties to this action. None has taken exception to that portion of the judgment by which each is directed to permit reasonable entrance on his property for [abatement of the nuisance].

365 N.Y.S.2d at 529, 324 N.E.2d at 886. The opinion simply does not vindicate Westwood's claim that the defense of caveat emptor is inapplicable to a private-nuisance claim brought by a commercial purchaser of land who had many years to discover

and to take steps to abate an alleged nuisance.

Finally, in *Tahini Investments, Ltd. v. Bobrowsky,* 99 A.D.2d 489, 470 N.Y.S.2d 431 (2d Dep't 1984), cited by Westwood as an example of how New York courts have recognized exceptions to the defense of caveat emptor, *see* Item 19 at 16 n. 6, the court did not even discuss the defense.

Without a more definitive indication from New York's courts that the state's common-law doctrine of caveat emptor does not apply to cases such as the one at bar, well-established principles of federalism dictate that this court refrain from extending the scope of private-nuisance liability beyond its traditional bounds.[12] National Fuel's motion for summary judgment with regard to Westwood's private-nuisance claim is, therefore, granted.

### d) Westwood's Fourth Cause of Action

In its fourth cause of action, Westwood alleges that National Fuel, by "depositing and disposing of chemicals and chemical waste materials" at the site without giving notice thereof when it conveyed the property, has caused and will continue to cause Westwood "to incur substantial costs and expenses to properly respond to and abate the conditions at and in the vicinity of the Premises caused by National Fuel's intentional and/or negligent acts." Item 1 at ¶ 41. Westwood asserts that it is entitled to "restitution" for these costs and expenses because "otherwise National Fuel will be unjustly enriched at the cost and expense of Westwood." *Id.* at ¶ 43. *See also id.* at *ad damnum* clause, ¶ 4.

National Fuel argues that Westwood's fourth cause of action is, essentially, a reiteration of Westwood's public- and private-nuisance claims and, consequently, does not state a separate cause of action. Alter-

---

11. The court notes that in stating that the defendants in *Ole Olsen* had conveyed their entire interest in the properties at issue "several years ago," the New York Court of Appeals did not make clear whether it meant to say that the properties had been conveyed several years before the court's opinion or several years before the original lawsuit was filed. In any event, the doctrine against alienation of nuisances was applied in the case.

12. In *Philadelphia Electric Company v. Hercules, Inc.,* the Third Circuit held that, under Pennsylvania law, the landowner could not maintain a cause of action based on private nuisance against the corporate successor of the vendor. *See* 762 F.2d at 312–15.

natively, National Fuel argues that, to the extent it does not constitute a distinct claim, Westwood's fourth cause of action sounds in tort and is thus barred by New York's three-year statute of limitations. Item 14 at 42–43.[13]

 The court agrees on both points. Westwood's claim that its fourth cause of action is based on a claim of unjust enrichment, thereby entitling Westwood to the benefit of a six-year statute of limitations, Item 19 at 17,[14] simply does not hold up under the facts presented here. A fair reading of the complaint indicates that the allegations made in and the relief sought by the fourth cause of action are, essentially, those of Westwood's second and third causes of action. Moreover, to the extent that Westwood's fourth cause of action might be construed as a separate cause of action, the gravamen of that claim centers on National Fuel's alleged "intentional and/or negligent acts." It thus sounds in tort and, consequently, must be dismissed as barred by the three-year statute of limitations.

### e) Westwood's Liability Under CERCLA

National Fuel also seeks summary judgment on its counterclaim for recovery of response costs it allegedly incurred consistent with the NCP. As Westwood concedes that it is currently the owner of the site it describes as a "facility"[15] from which there has been a release or threatened release of hazardous substances within the meaning of CERCLA, it clearly is strictly, jointly, and severally liable for any response costs that are consistent with the NCP. 42 U.S.C.A. § 9607(a)(1) (Supp.1989); *State of New York v. Shore Realty Corp.*, 759 F.2d at 1043–45. However, whether National Fuel, in fact, has incurred such response costs is not clear from the present record. That issue, therefore, must be resolved at trial.

### II. *Westwood's Motions for Partial Summary Judgment and for Declaratory Judgment*

 Westwood's motions for partial summary judgment and for declaratory judgment on its CERCLA claim do not require extended discussion. Westwood asserts that it should prevail on these motions if the court finds that Iroquois disposed of hazardous wastes at the site. The court finds, however, that, even assuming *arguendo* that Iroquois did dispose of hazardous wastes there, National Fuel has raised a triable issue on its defense under Section 107(b)(3).

The court thus rejects Westwood's argument that, as a matter of law, National Fuel cannot raise this defense. Section 107(b)(3) provides in relevant part:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> . . . .
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs *in connection with* a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned ... and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions....

42 U.S.C.A. § 9607(b)(3) (emphasis added). Westwood argues that National Fuel can-

---

**13.** N.Y.Civ.Prac.L. & R. § 214(4) (McKinney Supp.1990) provides that "an action to recover damages for an injury to property" must be commenced within three years of the time that the cause of action accrued "except as provided in section 214–c." Westwood has not invoked § 214–c in support of its position. *See generally* N.Y.Civ.Prac.L. & R. § 203 (McKinney 1972 & Supp.1990).

**14.** N.Y.Civ.Prac.L. & R. § 213(1) (McKinney Supp.1990) provides that "an action for which no limitation is specifically prescribed by law" must be commenced within six years of the time that the cause of action accrued.

**15.** *See* 42 U.S.C. § 9601(9).

not avail itself of this defense because its sale of the site to Westwood rendered the parties contractually related within the meaning of Section 107(b)(3). So construing the statute, however, would effectively render the "in connection with" language superflous, and such constructions should be avoided whenever possible. *See, e.g., Ohio Power Co. v. Federal Energy Regulatory Commission,* 880 F.2d 1400, 1406 (D.C.Cir.) (constructions that render statutory language meaningless are disfavored), *reh'g and reh'g en banc denied,* 897 F.2d 540 (D.C.Cir.1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 1522, 108 L.Ed.2d 762 (1990); *National Ass'n of Recycling Industries, Inc. v. Interstate Commerce Commission,* 660 F.2d 795, 799 (D.C.Cir. 1981) ("[I]t is a fundamental principal of statutory construction that ' "effect must be given, if possible, to every word, clause and sentence of a statute." ... [sic] so that no part will be inoperative or superfluous, void or insignificant.' ") (citations omitted).

That a contractual relationship exists between the parties is not disputed: National Fuel concedes that the deed between Iroquois and Westwood falls within the meaning of Section 101(35)(A), 42 U.S.C. § 9601(35)(A). *See* Item 23 at 21. National Fuel argues, however, that not every contractual relationship precludes a former owner from invoking Section 107(b)(3), and that it is entitled, therefore, at least to present proof that Westwood's construction activities at the site were not undertaken "in connection with" its contractual relationship with Iroquois or National Fuel. The court agrees. Contrary to Westwood's argument, this court's decision in *United States v. Hooker Chemicals & Plastics Corp.,* 680 F.Supp. 546 (W.D.N.Y.1988), does not hold otherwise. In that case, the court found that Occidental Chemical Corporation, the corporate successor of the company that had disposed of hazardous substances at the Love Canal landfill in Niagara Falls, New York, could not assert a Section 107(b)(3) third-party defense because of the particular contractual relationship between it and the parties to whom the property had been deeded. The court held that

OCC's direct or indirect contractual relationships with both the Board [of Education of the City of Niagara Falls] and the City [of Niagara Falls] preclude the company's assertion of a viable third-party defense in this case because, as the plaintiffs assert, OCC was able to control the acts of these subsequent purchasers because of the nature of its relationship with these defendants in this case.

680 F.Supp. at 558. Westwood has not shown that its contractual relationship with National Fuel sufficiently approximated those between Occidental and the subsequent purchasers in that case so as to entitle Westwood to a similar pretrial ruling here.

### III. *Westwood's Motion for Summary Judgment on National Fuel's Affirmative Defenses*

In light of the discussion above in section "I," several of National Fuel's affirmative defenses cannot be maintained with regard to Westwood's CERCLA claim. In particular, Westwood is entitled to summary judgment on National Fuel's first, sixteenth, and eighteenth affirmative defenses.

Several other defenses clearly must fall. In particular, summary judgment is granted on National Fuel's fourth and ninth affirmative defenses, challenging the constitutionality of CERCLA, *see United States v. Hooker Chemicals & Plastics Corp.,* 680 F.Supp. at 556–57; *United States v. Monsanto Co.,* 858 F.2d at 173–75; on its seventh affirmative defense, alleging that recovery is precluded because the site at issue is not on the National Priority List,[16] *see State of New York v. Shore Realty Corp.,* 759 F.2d at 1045–47; *State of New York v. General Electric Co.,* 592 F.Supp. at 302–04; on its eighth affirmative defense, alleging that recovery is precluded because Westwood's activities were not approved, directed, or certified by state or federal authorities, *see International Clinical Laboratories, Inc. v. Stevens,* 710 F.Supp. 466, 472 (E.D.N.Y.1989); *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1575 (5th Cir.1988); *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 891–92 (9th Cir.1986); on its

**16.** *See* 42 U.S.C. § 9605.

tenth affirmative defense, asserting that any alleged depositing of hazardous substances at the site by National Fuel was done in accordance with state-of-the-art methods and industry practice, *see State of New York v. Shore Realty Corp.*, 759 F.2d at 1042; and on its eleventh affirmative defense, claiming that recovery is precluded because any violations alleged in the complaint either were not proximately caused by National Fuel or resulted from a superseding cause beyond National Fuel's control. *Id.*

In light of the discussion above in section "II," it is clear that Westwood is not entitled to summary judgment with regard to National Fuel's fifth, fourteenth, and nineteenth affirmative defenses.

The viability of the balance of defenses challenged by Westwood with regard to its CERCLA claim, namely, National Fuel's second, twelfth, seventeenth, twentieth, and twenty-first affirmative defenses, shall be addressed at trial.

In sum, National Fuel's motion for summary judgment is granted in part and denied in part. It is granted insofar as it seeks dismissal of Westwood's private-nuisance claim and fourth cause of action, and a declaration that Westwood is liable for response costs as a current owner; it is denied insofar as it seeks dismissal of Westwood's CERCLA and public-nuisance claims, and a declaration that it has incurred response costs consistent with the NCP. Westwood's motions for partial summary judgment under CERCLA and for declaratory judgment pursuant to CERCLA and the Declaratory Judgment Act are denied. Westwood's motion for summary judgment regarding National Fuel's affirmative defense is granted insofar as it seeks dismissal of National Fuel's first, fourth, seventh, eighth, ninth, tenth, eleventh, sixteenth, and eighteenth affirmative defenses; it is otherwise denied.

The court will meet with counsel on June 6, 1990, at 9:00 a.m.

So ordered.