State of NEW YORK and Thomas C. Jorling, Commissioner of the New York State Department of Environmental Conservation, Plaintiffs,

v.

WESTWOOD–SQUIBB PHARMACEU-TICAL CO., INC., and National Fuel Gas Distribution Corporation, Defendants.

No. 90–CV–1324C.

United States District Court, W.D. New York.

Dec. 12, 2000.

Buchanan Ingersoll Professional Corporation (Daniel M. Darragh, of counsel), Pittsburgh, PA, for defendant Westwood–Squibb Pharmaceutical Co., Inc.

Phillips, Lytle, Blaine, Hitchcock & Huber (Robert E. Glanville, of counsel), Buf-

falo, NY, for defendant National Fuel Gas Distribution Corporation.

## INTRODUCTION

CURTIN, District Judge.

Presently pending before the court are National Fuel Gas Corporation ("National Fuel") and Westwood–Squibb Pharmaceutical Company's ("Westwood") respective motions for partial summary judgment. Items 175 and 179. National Fuel seeks to establish Westwood's liability for the contamination and response costs associated with the banks and sediment bed of the Scajaquada Creek, while Westwood seeks to establish National Fuel's liability for the contamination and response costs associated with 8.8 acres of property that Westwood owns at Dart and Bradley Streets in the City of Buffalo ("the Westwood Property").

## BACKGROUND

In 1990, this court found that the Westwood Property was used for manufactured gas operations—starting at the turn of the century and ending in 1951. *See Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.,* 737 F.Supp. 1272, 1275 (W.D.N.Y.1990) (*"Westwood I "*). The parties seem to agree that contamination of the Westwood Property resulted from the wastes that are typically created by a manufactured gas plant. As such, the parties agree that the Westwood Property's contamination is *ultimately* attributable to the manufactured gas plant ("Manufactured Gas Plant") that operated on the site from approximately 1898 until 1951.

In 1990, this court held that Westwood is liable for the contamination of the Westwood Property, since it was admitted that Westwood is the current owner. *See Westwood I,* 737 F.Supp. at 1285. Fur-

thermore, the court has recently held that National Fuel bears successor liability as an *owner* of the Westwood Property from 1898 through 1972 and as an *operator* at the Westwood Property from 1898 to 1901 and then again from 1917 to 1972. *See State of New York v. Westwood–Squibb Pharmaceutical,* 62 F.Supp.2d 1035, 1036, 1047 (W.D.N.Y.1999).

The principal questions raised by the present motions are: (1) whether the Westwood Property—an 8.8 acre site presently owned by Westwood—has caused contamination of the Scajaquada Creek's eastern banks and sediment bed ("the Creek Property"); and (2) whether National Fuel's successor liability compels a finding that National Fuel is liable for contamination of the Westwood Property.

## DISCUSSION

### I. National Fuel's Motion for Partial Summary Judgment

There are two issues that arise from National Fuel's motion for partial summary judgment: (1) whether the Westwood Property (often referred to as "the Site" by Westwood), again consisting of 8.8 acres of land bounded by Dart and Bradley Streets, is a separate CERCLA facility from the Creek Property by virtue of the fact that the *Westwood Property is a separate CERCLA facility from the Manufactured Gas Plant;* and (2) assuming that the Westwood Property and the Manufactured Gas Plant are separate CERCLA facilities, whether there has been a release of hazardous substances from the Westwood Property to the Creek Property—again where the Westwood Property's 8.8 acres of land is exclusive of the Manufactured Gas Plant and its underground pipelines and tanks.

A. *The Westwood Property and The Creek Property: Are They Separate CERCLA Facilities?*

The court must begin its inquiry into Westwood's alleged liability for the Creek Property's contamination by reviewing this court's 1990 order ("*Westwood I* ").

In 1990, the court described the "site at issue" in the following way: "The site ... encompasses approximately 8.8 acres bounded on the west by DeWitt Street, on the south by Bradley Street, on the east by Dart Street, and on the north by land owned by the Buffalo Structural Steel Corporation. The northwest corner of the site is bounded by Scajaquada Creek." *Westwood I*, 737 F.Supp. at 1275. By the order of 1990, this court found "Westwood concedes that it is currently the owner of the site it describes as a 'facility' from which there has been a release or threatened release of hazardous substances within the meaning of CERCLA, [thus] it clearly is strictly, jointly, and severally liable for any response costs...." *Westwood I*, 737 F.Supp. at 1285 (footnote omitted).

In that 1990 order, however, the court was not called upon to define the exact nature of the "facility" for which Westwood would be held liable. Accordingly, National Fuel insists that the court's 1990 description of the Westwood Property should not be the final word in defining the CERCLA *facility* for which Westwood is liable.[1] The court agrees and finds that the 1990 order's description of the "site" does not resolve the issues raised by National Fuel's present motion, especially since the issues before the court today are so different from those before the court in 1990.[2]

Thus, the court must resolve the following dispute: whether the CERCLA "facility" for which Westwood is liable includes the Creek Property, or whether it is limited to the 8.8 acres of land often referred to as "the Westwood Property."

National Fuel argues that Westwood's CERCLA "facility" must include both the Westwood Property's 8.8 acres *and* the adjacent Creek Property. Here, National Fuel relies on CERCLA's definition of a "facility," which defines the scope of a facility quite broadly. Specifically, CERCLA provides that a facility is:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located....

42 U.S.C. § 9601(9). National Fuel urges this court to construe the term "facility" broadly and notes that " 'what matters for purposes of defining the scope of facility is where the hazardous substances were "de-

---

1. "Not surprisingly, since Westwood's complaint in 1988 sought reimbursement for cleanup costs pertaining only to its own property, the Court's reference to the 'site at issue' was similarly defined to the same geographic boundaries" of the 8.8 acres bounded by Dart and Bradley Streets. Item 176, p. 2. At this stage of the litigation, however, it is *National Fuel* that seeks to establish Westwood's liability for contamination of the Creek Property.

2. On this count, the court notes the confusion that can be created by referring to a CERCLA facility as a "site," since a "site" is but one of several terms that the statute uses to describe a "facility." 42 U.S.C. § 9601(9). Although Westwood continually refers to the 8.8 acres bounded by Dart and Bradley Streets as "the Site," for the purposes of clarity, the court will refer to those 8.8 acres as "the Westwood Property" and will refer to any CERCLA facility by using the term "facility" in preference to the term "site."

posited, stored, disposed of", ... or have otherwise come to be located.'" *Akzo Coatings, Inc. v. Aigner Corp.*, 960 F.Supp. 1354, 1358 (N.D.Ind.1996) (quoting *Northwestern Mut. v. Atlantic Research* 847 F.Supp. 389, 395–96 (E.D.Va.1994) (emphasis omitted)). National Fuel insists that the Westwood Property and the Creek Property must be deemed to be part of the same facility because the Creek Property's contamination was ultimately a result of the hazardous wastes that were created by the Manufactured Gas Plant, which was operated on the Westwood Property from 1897 until 1951.

Westwood agrees with National Fuel to a point. That is, Westwood concedes that the Creek Property's contamination is attributable to "end-of-pipe" discharges and other "direct disposals" of wastes that came from the Manufactured Gas Plant.[3] *See* Item 180, p. 11. However, Westwood maintains that *the Westwood Property is a separate facility from the Manufactured Gas Plant.* Thus, Westwood contends that it cannot be held liable for contamination of the Creek Property because: (1) it was the Manufactured Gas Plant that caused the Creek Property's contamination, and (2) the Westwood Property and the Creek Property are separate facilities by virtue of the fact that the Westwood Property *and the Manufactured Gas Plant* are separate facilities.

Put another way, Westwood contends that it did not purchase the Manufactured Gas Plant and its related subsurface structures when Westwood purchased the Property's 8.8 acres in 1972.

If the court rejects Westwood's argument and finds that the Westwood Property must be deemed to include the Manufactured Gas Plant, then Westwood will have essentially conceded the following point: if the facility for which Westwood is liable includes the Manufactured Gas Plant and if, as Westwood admits, the Manufactured Gas Plant contaminated the Creek Property,[4] then it would follow that Westwood is liable for the Creek Property's contamination.[5]

#### 1. *Westwood's "Two Facility" Theory*

Westwood asserts that it did not buy the Manufactured Gas Plant—and its various subsurface pipes, pipelines, and tanks—when it bought the Westwood Property in 1972. Westwood asserts that the Westwood Property and the Manufactured Gas Plant represent an example of a "two facility" or "two site" case—also referred to as a "facility within a facility" case. *See, e.g., Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir.1999) (involving different facts from present case, but recognizing special considerations of a legitimate "two site" case).

Westwood's "two facility" argument can be summarized in the following way: (1) As of 1972, there was no Manufactured Gas Plant on the Westwood Property;[6] (2)

---

**3.** Throughout this Memorandum, the phrase "Manufactured Gas Plant" will sometimes be used to signify the various subsurface structures that remained in place after Westwood bought the Property in 1972.

**4.** Westwood appears to concede that the Manufactured Gas Plant and the Creek Property are part of the same CERCLA facility, since they share a common source of contamination. *See* Item 180, p. 7 (citing *Atchison,*

*Topeka* for the rule that CERCLA facility is defined by common *source* of contamination).

**5.** Here, the court notes that although Westwood admits that direct disposals from the Manufactured Gas Plant caused the Creek Property's contamination, *see* Item 181, ¶ 10, National Fuel does not concede as much. *See* Item 186, pp. 1, 9–10.

**6.** National Fuel contests this characterization of the facts and points out that some of the

by 1972, the Westwood Property's 8.8 acres were contaminated with a number of hazardous substances—including polycyclic aromatic hydrocarbons ("PAHs" or "TPAHs") that were dissolved in the groundwater and dense non-aqueous phase liquids (or "DNAPLs," commonly referred to as "tars") that were also present in the soil; (3) by 1972, the Westwood Property—exclusive of the Manufactured Gas Plant—had become its own separate and distinct CERCLA facility; (4) Westwood admits liability for any releases from the Westwood Property, whether those releases traveled to the Creek Property or elsewhere; and (5) Westwood denies liability for direct releases from the Manufactured Gas Plant, which operated on the Property from approximately 1898 until 1951. *See* Item 180, pp. 11–13. In sum, Westwood asserts that "the manufactured gas plant formerly located on the Westwood Property constitutes a facility within a larger facility—*i.e.*, the Site [or 'the Westwood Property']." Item 180, p. 11 n. 15.

As support, Westwood relies on *Atchison, Topeka & Santa Fe Railway Company v. Brown & Bryant, Inc.*, 1995 U.S.Dist. LEXIS 20627 (E.D.Cal. Nov. 15, 1995), and *Nurad, Inc. v. William Hooper & Sons Co.*, 966 F.2d 837 (4th Cir.1992).

In *Atchison, Topeka*, the facts in that case warranted a finding that one CERCLA facility was contained within another, larger facility.

> [A] single geographical location may contain multiple "facilities." "Facilities" may even be contained within other "facilities." [For example, the plaintiff's] Complaint [was found to] state[ ] a claim against ... defendants Dow and Shell, because it alleged they owned rail cars on the Arvin or Shafter sites, from which releases of hazardous substances

had occurred. Whether these rail cars were on Brown & Bryant's property or the Railroads' property, they were "facilities" within a larger "facility."

*Atchison, Topeka*, 1995 U.S.Dist. LEXIS 20627, at *11. *Atchison, Topeka* is factually distinct from the present case. In *Atchison, Topeka*, the court logically concluded that the railcars were a separate "facility" from the land on which they sat because the railcars were not fixtures of the land; therefore, by their nature being mobile and subject to relocation at any time. Put another way, basic tenets of Real Property law reveal that a hypothetical buyer of those "Arvin" or "Shafter" sites would *not* have taken title to the railcars as a result of signing a contract to buy the land on which the railcars sat. *See* Item 186, pp. 6–8 (discussing Real Property law's effect on the present issues). Therefore, *Atchison, Topeka* does not support Westwood's argument that the *pipelines and tanks*, which are beneath the Westwood Property, should be deemed a separate facility from the Westwood Property itself.

Westwood also relies on *Nurad* in an effort to prove that the Manufactured Gas Plant's tanks and pipelines area separate facility from the Westwood Property. In *Nurad*, the Fourth Circuit upheld the district court's determination that a number of underground storage tanks ("USTs") were a separate CERCLA facility from the parcel of land under which they were situated. The *Nurad* court reasoned:

> In this case, the only "area" where hazardous substances have "come to be located" is in and around the storage tanks, so the relevant "facility" is properly confined to that area. To be sure, the tanks are a part of the larger piece

Gas Plant's above-ground structures were still standing at the time that Westwood signed the

contract to buy the Westwood Property. *See* Item 186, p. 6 (citing to the record).

of property that is now the Nurad site. During the relevant period, however, the site was subdivided and separate portions of it were leased out to individual tenants. The fact that those tenants may have had control over a building that was adjacent to the USTs is irrelevant . . . ; a defendant operates a "facility" only if it has authority to control the area where the hazardous substances were located. Thus while liability under § 9607(a)(2) is strict, it nonetheless extends only to those who have authority over the area where hazardous substances are stored.

966 F.2d at 842–43 (citation omitted). Relying on *Nurad*, Westwood argues:

[I]n *Nurad*, the Fourth Circuit's impetus for not defining the relevant CERCLA facility to encompass the entire site, including the leased parcels, was to avoid the imposition of liability on those parties who neither placed the hazardous substances in the tanks from which the releases occurred, nor had any authority whatsoever over them.

Item 180, p. 11 n. 15. *Nurad* is very persuasive authority, as far as it goes. Yet, *Nurad* and the present action are materially different for several reasons.

First, the court in *Nurad* found that the USTs were a separate facility from the land above, partly because the court was inquiring into *operator* liability. In this case, the court is inquiring into Westwood's liability as a *current owner* of the Westwood Property and, potentially, the Manufactured Gas Plant's underground pipelines and tanks. This distinction between operator and current owner liability represents a relevant difference. That is, in *Nurad*, *operator* liability was contingent on a showing that the alleged operator had actual control or the authority to control

"the operations or decisions involving the disposal of hazardous substances at the Site or the contents of the USTs." *Id.* at 842 (internal quotations omitted). In this case, though, the issue of control over the underground pipelines is irrelevant to ownership liability under section 9607(a)(1) of CERCLA. *See, e.g., United States v. Monsanto Co.,* 858 F.2d 160, 169 (4th Cir. 1988) (holding site owners liable regardless of degree of participation in disposal of hazardous wastes). Similarly, in *Nurad*, it was critical that the defendants were *tenants*, as opposed to landowners, and that they had no right under their leases to access or control the USTs in any way. 966 F.2d at 843–44 ("Under the circumstances, the tenant defendants may even have been trespassing if they had attempted to assume the role of 'operator' of the USTs."). Based on these unique facts, the *Nurad* court found that the USTs were a separate facility from the land under which they were situated. There are no similar considerations in this case, since Westwood is the owner of the Westwood Property, not a tenant, and had complete and total authority over the Manufactured Gas Plant's underground pipelines and tanks.

*Nurad* and this case are also distinguishable, because in *Nurad* the USTs represented the "only 'area' where hazardous substances have come to be located." *Id.* at 842. In this case, however, there is no similar claim. Rather, the Consent Decree and the State DEC's Record of Decision ("ROD") recognize that the Westwood Property is widely contaminated with the same hazardous wastes that can be found in the tanks and pipelines under the Westwood Property. *See* Item 175, Exh. C, ¶¶ 1, 13, 16 & Exh. E, Fig. 5A; *see also infra* (discussing *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.,* 191 F.3d 409, 417–19 (4th Cir.1999)).[7]

---

7. As an aside, the court in *Nurad* recognized, as a general matter, that underground struc-

The distinctions between this action and cases like *Atchison, Topeka* and *Nurad* weigh against a finding that this is a "two facility" case.

### 2. *"Two Facility" Theory Rejected: Westwood Property and Manufactured Gas Plant Are Single CERCLA Facility*

Westwood's "two facility" theory is even less tenable in light of *Axel Johnson, Inc.*, 191 F.3d at 414, where the Fourth Circuit rejected plaintiff Axel's suggestion "that all the tanks and associated spill areas for which [Axel] disclaims responsibility should be regarded as a single, distinct facility." *Id.* at 418. More specifically, the court there held that the property's above-ground pipelines and tanks[8] should be deemed to be part of the same CERCLA facility as the surrounding land because those structures and the land were found to be contaminated with lead, a hazardous substance under CERCLA. The *Axel Johnson* court distinguished its decision in *Nurad*[9] and observed that lead was present both in the property's tanks and pipes, as well as throughout the property generally.

Axel itself acknowledges that in addition to the tanks and their spill areas, the furnace refractory burial area and two other areas require soil investigation and cleanup.... Finally, Axel utterly fails to controvert the record evidence of lead contamination in the pipelines that run throughout the property.

·

These places containing uncontested contamination are, furthermore, scattered across the Refinery property. The pipelines, as noted, run throughout the property....

191 F.3d at 418 (internal quotation omitted). In sum, the court found that it was "unambiguously clear from the record that ... [there is] contamination throughout the property." *Id.* The court concluded: "Courts have uniformly refused to divide widely contaminated properties like the one at issue here into separate facilities in response to a party's claim to be responsible for contamination in only certain parts of the property." *Id.* at 418.

 Much like the court in *Axel*, this court refuses to divide a widely contaminated piece of property (*i.e.*, the Westwood Property) into separate CERCLA facilities. Rather, the court finds that the Westwood Property and the Manufactured Gas Plant—with its various underground structures—share the same type of contaminants and, therefore, should be treated as a single CERCLA facility. Therefore, when the court hereinafter refers to the "Westwood Property," it will be with the understanding that the Westwood Property is a CERCLA facility that includes the 8.8 acres of land as well as the Manufactured Gas Plant.

### 3. *Current Owners and Prior Disposal*

Although the court has declined to divide the Westwood Property and Manufac-

---

tures such as pipelines and storage tanks are typically part of the same facility as the surrounding property. "To be sure, the tanks are a part of the larger piece of property that is now the Nurad site." *Nurad*, 966 F.2d at 843.

**8.** The fact that *Axel* involved above-ground pipelines and tanks, as opposed to the subsurface variety present in this case, does not appear to be a meaningful distinction when it

comes to determining whether the pipelines and tanks should be considered a separate facility from the surrounding property.

**9.** "This might be a valid argument if the tanks and their associated spill areas were the only contaminated parts of the property. *See Nurad*, 966 F.2d at 842–43." *Axel*, 191 F.3d at 417.

tured Gas Plant into separate facilities, the court must still address Westwood's argument that it cannot be held liable for end-of-pipe and direct discharges from the Manufactured Gas Plant. In light of the court's finding that the Westwood Property and the Manufactured Gas Plant are a single CERCLA facility, Westwood's argument amounts to a request that the court carve out an exception to liability based on *when* disposals occurred at the Westwood Property. Such a request must be denied in light of settled law from this circuit.

■ As a current owner, Westwood is liable under section 9607(a)(1) of CERCLA. Furthermore, as a § 9607(a)(1) party, Westwood cannot claim immunity based on the theory that disposal occurred prior to its ownership. On this issue, the court looks to the court of appeals' decision in *State of New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir.1985).

> [Defendant] Shore argues that it is not covered by section 9607(a)(1) because it [did not] own[ ] the site at the time of disposal.... While section 9607(a)(1) appears to cover Shore, ... Shore claims that Congress intended that the scope of section 9607(a)(1) be no greater than that of section 9607(a)(2) and that both should be limited by the "at the time of disposal" language......
>
> Shore's claims of ambiguity are illusory; section 9607(a)'s structure is clear. Congress intended to cover different classes of persons differently. Section 9607(a)(1) applies to all current owners and operators, while section 9607(a)(2) primarily covers prior owners and operators. Moreover, section 9607(a)(2)'s

scope is more limited than that of section 9607(a)(1). Prior owners and operators are liable only if they owned or operated the facility "at the time of disposal of any hazardous substance"; *this limitation does not apply to current owners, like Shore.*

*Shore Realty*, 759 F.2d at 1043–44 (emphasis added). Under *Shore Realty*, Westwood's liability extends both to disposals that occurred during and before its ownership of the Westwood Property.

### 4. *Effect of Westwood's Admission*

Finally, the court must address Westwood's admission that the Creek Property's contamination is due solely to direct discharges from the Manufactured Gas Plant. Item 181, ¶ 10. In light of the court's finding that Westwood bears liability for disposals at the Manufactured Gas Plant, Westwood's admission *could* lead the court to find Westwood liable as a matter of law for the Creek Property's contamination. However, the court is hesitant to make such a ruling simply on the basis of Westwood's admission, since National Fuel *does not concede* that the Manufactured Gas Plant's direct disposals and end-of-pipe discharges caused contamination of the Creek Property.[10]

Therefore, for the purposes of this motion, the facility for which Westwood is liable includes the 8.8 acres of the Westwood Property, as well as the Manufactured Gas Plant's underground pipelines, storage tanks, and other related structures. In Part I, B of the Discussion, *infra*, the court inquires whether the Creek Property has been contaminated by

---

**10.** *See supra* n. 6. It is understandable for National Fuel to deny the connection between the Manufactured Gas Plant's direct discharges and the Creek Property's contamination. Indeed, any proof that the Manufactured Gas Plant directly released contaminants into the

Creek Property would hurt National Fuel in the allocation phase because National Fuel has succeeded to owner and/or operator liability for the Manufactured Gas Plant. *See infra.*

the leaching of contaminants from the more broadly defined Westwood Property.

### B. *Contamination of the Creek Property by the Westwood Property*

As set forth *supra,* the Westwood Property is a CERCLA facility that includes 8.8 acres and Manufactured Gas Plant's various pipelines, tanks, etc. The question that remains is whether the Westwood Property—as a CERCLA facility—*also* includes the Creek Property.

In arguing against liability for the Creek Property, Westwood has relied almost exclusively on its theory that the Westwood Property and the Manufactured Gas Plant were separate CERCLA facilities. With that argument having been rejected, Westwood must argue that there is no conclusive proof that the Westwood Property released contaminants into the Creek Property. As a practical matter, the contaminants found in and around the Westwood Property are the very same that have been found in the Creek's banks and sediment bed. Indeed, it seems inescapable that the Creek Property was, at some point in time, contaminated by discharges from the Westwood Property.

The inquiry into Westwood's liability could end here, since it is so abundantly clear that the Creek Property's contamination was caused by releases from the Westwood Property. Nevertheless, brief attention will be paid to the evidence that specifically demonstrates how releases from the Westwood Property traveled through the Creek Property.

#### 1. *Contaminated Groundwater*

In this case, Westwood admits that a "release" of contaminants from the Westwood Property migrated towards and through the Creek Property. Indeed, Westwood admits that this release occurred *even during the term of Westwood's*

*ownership.* Westwood's own Remedial Investigation and Feasibility Study ("RI/FS") indicated that "contaminant loading" from the Westwood Property to the Creek Property had been ongoing prior to Westwood's remediation efforts which were undertaken some time in the early 1990s. For example, the RI/FS indicates that anywhere from 25 to 110 pounds of polycyclic hydrocarbons ("PAHs" or "TPAHs") migrated via groundwater from the Westwood Property towards the Creek Property. *See* Item 175, Exh. F, pp. 5–12 to 14 and 1–2 to 3.

▪ Nevertheless, Westwood maintains that its RI/FS also shows that the release of contaminated groundwater did not contribute to the cost of National Fuel's remediation efforts at the Creek Property. *See* Item 180, p. 10 (citing to Item 175, Exh. F, p. 5–16). Here, the court notes that CERCLA liability for a current owner is strict, joint, and several. *See Shore Realty,* 759 F.2d at 1044 (holding that "section 9607(a)(1) unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release without regard to causation" and narrowly construing CERCLA's three causation defenses). Thus, requiring a party to satisfy a stringent standard of proof on the issue of causation would interject an improper burden into CERCLA's strict liability analysis. Any proof on the issue of causation is best left to the allocation phase of CERCLA litigation. *See Prisco v. A & D Carting Corp.,* 168 F.3d 593, 606 (2d Cir.1999) ("No causation is needed, however, to establish liability under CERCLA ... because it is ... a strict liability statute" (quotation and citation omitted)); *Akzo Coatings, Inc. v. Aigner Corp.,* 960 F.Supp. 1354, 1359 (N.D.Ind. 1996) ("Causation [is] ... irrelevant when determining liability").

■ For the reasons discussed *supra,* the court rejects Westwood's insistence that National Fuel prove causation between releases from the Westwood Property and the response costs at the Creek Property.

In any event, the record reveals that contaminated groundwater from the Westwood Property has, in fact, "adsorbed" onto the Creek's banks or sediment bed. In a deposition, Westwood's lead expert witnesses, Dr. Charles Faust, essentially admitted as much.

Q: Let's go back to dissolved contaminants in groundwater. You agree that prior to the installation of a sheet pile wall and a pump and treat system, there was groundwater moving across—

. . . . .

—across the Westwood Property transporting with it dissolved contaminants, including [polycyclic hydrocarbons or "PAHs"]?

A: Yes.

Q: And that groundwater would have flowed to and through the bed and banks of Scajaquada Creek?

A: Yes.

Q: Do you agree that at least some of the dissolved contaminants would have been adsorbed onto the sediments of the creek bank and the creek bed as a result of those groundwater discharges?

. . . . .

A: My opinion is that there may have been times in the past where there was a lot more absorption going on, but as we march through time, and the banks had the opportunity to absorb TPH's, they would have absorbed it to a certain level, and then if you have actual tars that are deposited in the creek by end of pipe, then that would tend to diminish the potential for dissolved contaminants to adsorb to the sediments.

Q: I take it you would agree that as long as there was discharge of dissolved contaminants from the groundwater on the site to and through the creek sediments, at least some molecules of those PAH's would have been adsorbed onto the creek sediments and banks?

A: Onto the clean creek sediments and banks that it passed by.

. . . . .

Q: [A]s a matter of fact, wouldn't you agree that . . . as long as dissolved PAH's were migrating from the [Westwood Property] to the creek sediments, at least some molecules of those PAH's would have had adsorbed to the creek sediments adjacent to the site?

A: To the creek sediments, yes.

*See* Item 192, Exh. A, pp. 90–94. Dr. Faust's opinions refute Westwood's argument that there is "no evidence to show" that the Creek Property adsorbed hazardous substances as a result of the Westwood Property's release of contaminated groundwater.

In the end, the foregoing discussion only confirms what is apparent: contamination of the Westwood Property ultimately caused contamination of the Creek Property. As such, the Westwood Property and the Creek Property are part of the same CERCLA facility. *See Atchison, Topeka,* 1995 U.S.Dist. LEXIS 20627, at *12, 14 (explaining that CERCLA facility is defined by common *source* of contamination). Westwood's liability for the Westwood Property's contamination, then, gives rise

to liability for the Creek Property's contamination.[11]

## II. Westwood's Motion for Summary Judgment

In its motion for summary judgment, Westwood demands that National Fuel be held liable under section 9607(a)(2) of CERCLA as a past owner and operator of the Westwood Property as *well* as the Creek Property.[12] Item 179. For the same reasons, Westwood asks that the court dismiss the affirmative defense that National Fuel has asserted under section 9607(b)(3) of CERCLA, which provides immunity from liability for an otherwise liable party where the release of contaminants was caused solely by a contractually unrelated third party. *Id.*

In order for Westwood to prevail on its motion for summary judgment, it must do two things: (1) Establish that National Fuel, through its various predecessors, disposed of hazardous substances at the Westwood Property; and (2) prove that National Fuel's "third-party defense" under section 9607(b)(3) fails as a matter of law. *See* Item 186, p. 17 (containing identification of the issues before court).

### A. *CERCLA Context*

Here, it is important to note that CERCLA distinguishes between "disposing" of hazardous wastes and "releasing" hazardous wastes. CERCLA defines "disposal," vis-á-vis the Solid Waste Disposal Act, as:

[T]he discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be ... discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). On the other hand, CERCLA defines a "release" as:

[A]ny spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)....

42 U.S.C. § 9601(22). While CERCLA's definitions of "disposal" and "release" share several terms in common, there is a critical difference between these two terms of art. When a party *disposes* of a hazard-

---

**11.** As an aside, the court observes that the parties have submitted extensive argument on the issue of whether NAPLs (or "DNAPLs" or "non-aqueous phase liquids") have migrated from the Westwood Property and into the Creek Property. By way of explanation, NAPLs generally migrate through soil particles like clay or gravel, *see* Item 175, Exh. F, p. 5–8 and Item 192, Exh. B, pp. 93–94, while dissolved contaminants like PAH can travel via groundwater. National Fuel maintains that the present record establishes that NAPLs have contaminated the Creek Property by migrating from the Westwood Property. *See, e.g.,* Item 176, p. 10. Westwood, on the other hand, argues that National Fuel misconstrues the calculations from Westwood experts regarding NAPL "loading" from West-

wood to the Creek Property. *See* Item 180, pp. 9–10. It is not necessary for the court to resolve this dispute as to whether NAPL migration from the Westwood Property has contaminated the Creek Property since, as has been discussed, it is so readily apparent that other releases from the Westwood Property did, in fact, cause the Creek Property's contamination.

**12.** Westwood's demand that National Fuel be declared liable for both the Westwood Property and the Creek Property is rooted in Westwood's theory that direct disposals and end-of-pipe discharges from the Manufactured Gas Plant caused the Creek Property's contamination.

ous waste, the waste is essentially put in a position where it "may enter the environment," whereas when a party *releases* a hazardous waste, there is no question that it has gone "into the environment."

█ This distinction between "disposal" and "release" becomes especially important when a past owner, like National Fuel, asserts the so-called "third-party defense" under section 9607(b)(3) of CERCLA. Under the third-party defense, a past owner of a facility, which is "any person who *at the time of disposal* of any hazardous substance owned or operated any facility at which such hazardous substances were disposed," 42 U.S.C. § 9607(a)(2) (emphasis added), is *not* liable where it:

> can establish by a preponderance of the evidence *that the release or threat of release* of a hazardous substance and the damages resulting therefrom were caused solely by—

> > (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant....

42 U.S.C. § 9607(b)(3). It is clear, then, that the third-party defense concerns the *release* of hazardous wastes and that this defense is *irrelevant* to determining whether a past owner is liable under section 9607(a)(2) for the *disposal* of hazardous wastes. *See Westwood I*, 737 F.Supp. at 1278.[13]

### B. *"Disposal" of Hazardous Wastes by National Fuel's Predecessors*

### 1. *If People's Was "Owner" Under CERCLA, then National Fuel Is Liable for "Disposal"*

National Fuel asserts that Westwood has failed to demonstrate that National Fuel—through its predecessors—*disposed* of hazardous wastes at the Westwood Property. The crux of National Fuel's argument is this: Westwood cannot establish National Fuel's successor liability between 1901 and 1917, which was the period of time when People's Gas, Light & Coke Company ("People's") owned the Westwood Property and Buffalo Gas Company ("BGC") operated the Manufactured Gas Plant there. As a result of this alleged 17-year "gap" in National Fuel's successor liability, National Fuel maintains that there is a question of fact as to whether *any* disposal occurred at a time when National Fuel was an "owner" or "operator" and whether, in fact, *all* disposal occurred during BGC's operation of the Manufactured Gas Plant (*i.e.*, between 1901 and 1917).

This argument is curious, especially in light of the fact that this court has already held that National Fuel bears successor liability as an *owner* of the Westwood Property from 1898 until 1972. Yet, National Fuel now insists that it derives no CERCLA ownership liability from *People's* for the years 1901 to 1917 because People's, at that time, was a mere corporate shell of BGC during BGC's 17 years of operations. *See infra.*

---

**13.** In *Westwood I,* the court assumed for the purposes of argument that any depositing by Iroquois of receptacles containing hazardous substances would have been a "disposal" under CERCLA. The court went on to hold: "That [the hazardous substances] may have [entered the environment] only because of the actions of a third party—in this case, Westwood—is irrelevant for the purpose of determining whether they were 'disposed of' by Iroquois [or some other National Fuel predecessor] within the meaning of CERCLA." 737 F.Supp. at 1278.

Before discussing this argument in any detail, it is important to note a concession that National Fuel is making: National Fuel concedes that *if* People's is liable under CERCLA as an "owner" of the Westwood Property, then there would be no question that National Fuel's successor liability is continuous and that National Fuel is liable for *disposing* of hazardous wastes at the Westwood Property. As National Fuel indicated in an answer to a Westwood interrogatory: "[T]here is no reason to believe that any such Manufactured Gas Plant wastes were deposited on the Site prior to 1897 when the Manufactured Gas Plant facility was constructed on the Site by People's. Accordingly, National Fuel does not contend that . . . the Site became contaminated by [Manufactured Gas Plant] waste prior to 1897." Item 179, Exh. E, p. 13.

In other words, the Westwood Property was indisputably contaminated with wastes that were created by the Manufactured Gas Plant's operations. Further, it is undisputed that People's bought the Westwood Property in 1897 and then built the Manufactured Gas Plant in and around 1898. Operations at the Gas Plant then began some time around the turn of the century and ended in 1951. As a result, it must logically follow that *if* the court finds that National Fuel's successor liability is continuous and uninterrupted from 1898 to 1951, then National Fuel must be liable for the *disposal* of hazardous wastes at the Westwood Property. *See Westwood I*, 737

F.Supp. at 1275; *see also* Item 186, pp. 16–17 (containing National Fuel's arguments and apparent admissions on this issue); Item 180, pp. 14–16 (discussing evidence of disposal during Manufactured Gas Plant's operations).[14]

What is left for the court to decide, then, is whether People's was an "owner" under CERCLA. Resolving this question will answer the larger question of whether National Fuel derives successor liability from People's ownership of the Westwood Property from 1901 to 1917.

2. *BGC's "Domination" and "Control" of People's: Effect on People's Status as "Owner" Under CERCLA*

National Fuel argues that People's was not an "owner" under CERCLA because it was a legal fiction—a "nominal" owner of the Westwood Property during the time that BGC operated the Manufactured Gas Plant.

> Although the Court has found that National Fuel is a successor to People's, . . . that finding does not render "National Fuel" the owner prior to 1925; it simply means that National Fuel succeeded to any CERCLA liability of People's as an "owner." It is clear, however, . . . that People's has no CERCLA liability for the operations conducted on its property by Buffalo Gas Company from 1901 through 1917.

Item 186, p. 11. National Fuel asserts that People's cannot be held liable as an

---

**14.** Not only does this conclusion follow logically, it also follows as a matter of law. A finding of continuous successor liability would preclude National Fuel from arguing that it is not liable for disposal of hazardous wastes from the Manufactured Gas Plant because "disposal" extends even to "the . . . deposit . . . or placing of any . . . hazardous waste into *or on* any land . . . so that such . . . hazardous waste or any constituent thereof may enter the environment or be . . . dis-

charged into any waters, including ground waters." 42 U.S.C. § 6903(3) (emphasis added). In this case, there can be no question that hazardous wastes were deposited "into *or on*" the Westwood Property during the Manufactured Gas Plant's operations. Furthermore, "that those [hazardous] materials were deposited so that they 'may enter the environment . . .' is evident from the fact that they *did* enter the environment." *Westwood I*, 737 F.Supp. at 1278.

owner under CERCLA because of the way in which BGC "dominated and controlled" People's affairs from 1901 through 1917. In support of this somewhat novel argument, National Fuel relies principally on the findings of fact from *Green v. People's Gas, Light & Coke Co.*, which is a 1922 Special Term decision of the Supreme Court of Erie County, in which the court addressed the relationship between People's and BGC. *See* Item 186, Exh. 1. The court there found:

> 18. That the Buffalo Gas Company, owning every share of outstanding capital stock of the People's Company, elected and selected the board of directors and officers of the People's Company, and dominated and directed its affairs. That the said Buffalo Gas Company and People's Company had in common the same secretary and treasurer, had offices at the same place, in the City of Buffalo; that the directorate was interlocking, and where the People's Company did not have the same individuals as directors as did the Buffalo Gas Company, the directors were selected and named by the Buffalo Gas Company, which owned and possessed the entire issue of outstanding capital stock of the People's Company....
>
> 19. That the said Buffalo Gas Company, from the time of its organization, in 1899, controlled the said People's Company, and operated the said People's Company as a subsidiary of or as an adjunct to the Buffalo Gas Company, uninterruptedly.

*Id.* at 228–29.

Based on the foregoing evidence, National Fuel argues two alternative positions: (1) by way of analogy, this court should find that People's was a "mere corporate shell" of BGC and immunize People's from liability under CERCLA's "security interest exemption," *see* 42 U.S.C. § 9601(20)(A); (2) in the alternative, the court should immunize People's under CERCLA's third-party defense, *see* 42 U.S.C. 9607(b)(3), since BGC was solely responsible for the release of contaminants during People's term of ownership. *See* Item 186, pp. 10–20.

### a. Security Interest Exemption

CERCLA provides that a past owner or operator of a facility is liable for the costs of remediating a release that occurred during its term of ownership. 42 U.S.C. §§ 9601(20)(A), 9607(a). However, the term "owner" excludes "a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A). National Fuel attempts to analogize People's situation to an exempted owner under section 9601(20)(A). *See* Item 186, p. 12.

■ National Fuel's argument fails for at least two reasons. First, section 9601(20)(A)'s security interest exemption is narrowly drafted. The narrow nature of this exemption, together with CERCLA's remedial purpose and broad scope, leads this court to conclude that analogies to the security interest exemption are inappropriate. As one court has held: "[This] single exception to titleholder liability found in the statute exempts lenders who hold 'indicia of ownership primarily to protect [their] security interest.' This is further evidence that Congress intended the term 'owner' to have the broadest possible meaning." *City of Phoenix v. Garbage Services Co.*, 816 F.Supp. 564, 568 (D.Ariz. 1993) (citation omitted).

■ Moreover, the Second Circuit and Supreme Court have instructed lower courts to construe the term "owner" by "doing 'the best we can to give the term its

ordinary or natural meaning.'" *Commander Oil Corp. v. Barlo Equipment Corp.*, 215 F.3d 321, 327 (2d Cir.2000) (quoting *United States v. Bestfoods*, 524 U.S. 51, 66, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)). With this in mind, this court finds that if the term "owner" is to mean anything at all, its meaning must extend to those parties holding legal title to property. This conclusion finds support in case law. "[A]n 'owner' under CERCLA need not have any control over the disposal activity. Mere ownership of the property on which the release took place is sufficient to impose liability under § 107(a), regardless of any control or lack or [sic] control over the disposal activities." *United States v. A & N Cleaners and Launderers, Inc.*, 788 F.Supp. 1317, 1332 (S.D.N.Y. 1992), *overruled on other grounds by Commander Oil*, 215 F.3d 321 (citing various cases). Further, "record ownership of contaminated property suffices by itself to create CERCLA owner liability." *Truck Components, Inc. v. Beatrice Co.*, 1994 WL 520939, at *2 (N.D.Ill. Sep. 21, 1994). Finally, in a slightly different factual context, another court observed that "commentators uniformly agree that the term 'owner' under CERCLA includes trustees who *hold legal title only.*" *City of Phoenix*, 816 F.Supp. at 567 (emphasis added).

In light of the foregoing, any attempt to analogize People's to an exempted owner under section 9601(20)(A) is rejected. Rather, People's is an owner under CERCLA by virtue of the fact that People's held legal title to the Westwood Property from 1897 through 1925.

b. Third-party Defense on the Basis of BGC's Operations

In the alternative, National Fuel argues that People's is not liable as an owner for the years of BGC's operations because section 9607(b)(3) exempts owners from liability where releases "were caused solely by . . . an act or omission of a third party other than . . . one whose act or omission occurs in connection with a contractual relationship . . . with the defendant." 42 U.S.C. § 9607(b)(3). Here again, National Fuel maintains that People's was a legal fiction and exerted no control whatsoever over BGC's operations. As such, National Fuel argues that People's played no role in releases that occurred during BGC's operations and, therefore, cannot be held liable as an owner for releases that were caused "solely" by BGC—a third party.

Yet, BGC and People's entered into a lease so that BGC could conduct its manufactured gas operations on the Westwood Property. Under section 9607(b)(3), the existence of this lease is generally seen as a "defense barring contractual relationship." *See infra.*

Here, National Fuel again insists that People's was just a shell for BGC and, as a result, the lease cannot bar People's from asserting the third-party defense. More specifically, National Fuel argues: "[T]he *Green* case makes it clear that 'this so-called lease' with Buffalo Gas was a sham . . . ." The 'so-called lease' thus cannot operate as a " 'contractual relationship' so as to bar People's from raising the [9607](b)(3) defense." Item 186, pp. 13–14.

By arguing in this way, National Fuel illogically seeks to "have it both ways." Item 190, p. 10. That is: if this court were to (i) accept the State court's findings regarding the relationship between People's and BGC; (ii) conclude that BGC totally "dominated" and "controlled" People's from 1901 through 1917; and (iii) accept National Fuel's argument that the lease was "a sham"; *then* the court would be hard-pressed to find, vis-á-vis People's, that BGC is a *third party* of any kind.

The court finds that the lease between People's and BGC was a legitimate contract. This finding ends the need for further discussion, since such an agreement represents a defense-barring contractual relationship. *See* 42 U.S.C. § 9601(35)(A) ("The term 'contractual relationship', for the purpose of section 9607(b)(3) . . . includes, but is not limited to, land contracts"); *A & N Cleaners,* 788 F.Supp. at 1326, *overruled on other grounds by Commander Oil,* 215 F.3d 321 ("It is well established that a lease constitutes a 'contractual relationship' under § 107(b)(3)") (citing various cases).

Finally, on this issue of whether the lease between People's and BGC was a defense-barring agreement, National Fuel relies on *State of New York v. Lashins Arcade Co.,* 91 F.3d 353 (2d Cir.1996). However, *Lashins Arcade* is not contrary to the court's conclusion here. In that case, the court was faced with a "straightforward sale" of contaminated property and concluded that the contract of sale "clearly did not 'relate to hazardous substances . . . .' " *Id.* at 360 (citation omitted). The contract at issue in this case differs critically, because in this case there was a *lease,* not a sales contract. Furthermore, the lease here, unlike the sales contract in *Lashins Arcade, related to* BGC's operation of the Manufactured Gas Plant. Thus, there is no reason to doubt that the lease was "connected with" or "related to" the handling of hazardous substances.

In sum, National Fuel cannot assert, on People's behalf, section 9607(b)(3)'s third-party defense on the basis of BGC's operations from 1901 to 1917.

In light of the foregoing discussion, National Fuel bears successor liability for the entire period of the Manufactured Gas Plant's operations at the Westwood Property. Therefore, National Fuel is, as a matter of law, liable for any disposal of hazardous wastes at the Westwood Property that occurred during its term of ownership or operation. In light of the court's finding that *disposal* of hazardous waste undoubtedly occurred on the Westwood Property at some point between 1898 and 1972, *see supra,* the court is prepared to find National Fuel liable for the Westwood Property and Creek Property's contamination.

Before the court renders a decision on this issue, though, one question remains: whether there is sufficient evidence to support National Fuel's third-party defense, which is based on the theory that Westwood's 1985 construction project was the sole cause of any releases from the Westwood Property. *See infra.*

B. *National Fuel's Third–Party Defense and the Westwood Construction*

National Fuel also maintains that Westwood's motion for summary judgment should be denied because the release of contaminants was "solely" caused by Westwood's construction activities, which took place on the Westwood Property in and around 1985. Here, the court must first determine whether Westwood has demonstrated that there was a release of contaminants at the Westwood Property during National Fuel's term of ownership. The court must also determine whether National Fuel has submitted evidence that could support a reasonable inference that, under section 9607(b)(3), Westwood's 1985 construction activities were solely responsible for the release of contaminants at the Westwood Property.

1. *Westwood's Burden To Show Release During National Fuel's Ownership*

In support of its motion, Westwood relies on expert witness testimony and ar-

gues that the experts agree that there were releases of hazardous substances at the Westwood Property at some point during the term of National Fuel's ownership and/or operation. The court has already held that National Fuel is liable for the *disposing* of hazardous substances at the Westwood Property. The question that remains is whether the record also establishes that there were *releases* of those hazardous substances between the years 1898 and 1972.

On this count, Westwood cites to the deposition testimony of several experts in an effort to show that "releases" occurred at the Westwood Property prior to 1972 or, at the very least, prior to Westwood's 1985 construction.[15]

 A review of the relevant evidence reveals that Westwood has shown that there was a release from the Westwood Property during National Fuel's ownership or operation of the Property. First, Westwood cites to the admission National Fuel made in an answer to one of Westwood's Interrogatories:

National Fuel does not contend that no migration of groundwater across the [Westwood] Site occurred prior to Westwood's initiation of its construction activities. Under the circumstances, *even prior to Westwood's construction activi-*

ties, any such migrating groundwater likely would have become contaminated at such time as it came into contact with [Manufactured Gas Plant] wastes at or below the level of the groundwater....

Item 179, Exh. E, p. 13 (emphasis added). The plain import of the above-quoted language is that National Fuel has admitted that groundwater flowing through the Westwood Property became contaminated with hazardous wastes *prior* to Westwood's 1985 construction project. Such an admission is at odds with National Fuel's attempt to assert a third-party defense based on the theory that any release at the Westwood Property was solely the result of Westwood's construction activity.[16]

Moreover, Richard Eckert, who worked for Iroquois at the Manufactured Gas Plant in and around 1946 and 1947, *see* Item 189, Exh. C, p. 7, testified to witnessing a tar Spill[17] on the Westwood Property:

Q: ... How did they get into the tar tank to do that?

A: There was—they call it a manhole on the side. They took the manhole off and put the hose in and sucked the tar out.

Q: Okay. And then, when you say that they squeegeed it, that was, again, the contractors?

---

**15.** CERCLA defines a "release" to include "the abandonment ... of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant...." 42 U.S.C. § 9601(22). Initially, Westwood argues that National Fuel released contaminants into the environment by *abandoning* contaminated pipelines and tanks. Item 180, p. 18. However, Westwood does not pursue this argument by offering evidence of National Fuel's "abandonment." Therefore, this argument need not detain the court.

**16.** For reasons discussed in Part I of the Discussion, *see supra,* National Fuel cannot avoid liability here by arguing that the groundwater that became contaminated in

this way *caused* no contamination of the areas being remediated and no response costs. Again, arguments of causation are irrelevant to the liability analysis under CERCLA. Moreover, liability for a past owner or operator is established when it is shown that: (i) there has been a deposit of wastes at the facility, which has caused a party to incur response costs, and (ii) where there was also a deposit of contaminants during the defendant's term of ownership of that same facility. *See Axel Johnson,* 191 F.3d at 414.

**17.** Among other things, CERCLA deems a "spill" or an "escape" of hazardous substances to be a "release." 42 U.S.C. § 9601(22).

A: The contractors.

Q: Then, what was done?

A: Then, the crane hooked up to the bottom and they picked the bottom up and, of course, they turned the bottom section up and hauled it away.

Q: Was there any tar spillage in that process?

A: There was—at one time, I went there and there was—they were filling it up with clay.

Q: Filling what up with clay?

A: The area where the tar was spilled.

Q: Where was the tar spilled?

A: At the first tar tank.....

. . . . .

I was in my car, I remember, and I came down this road [on the Westwood Property]. It was in the relief holder, then the tar was right in this area here [ (indicating on map) ].

. . . . .

It was right in this area here [ (indicating again) ]. That's where the road turned.

. . . . .

The day when I got there, I could see the tar here, and this was covered up with clay.

. . . . .

Q: ... And would you tell us, again, this area was the area where what occurred?

A: Where there must have been some tar spilled, because the day I got there, there was clay. They were

starting to put clay there to cover it up.

. . . . .

Q: What's your best recollection of the size of the area you actually observed tar being present on the surface?

A: Maybe 100 square feet.

. . . . .

No, it was bigger than that.

Q: How deep was the deposit of tar that you saw?

A: About an inch.... Inch, inch-and-a-half.

Item 189, Exh. C, pp. 12–17, 34. Eckert's testimony is unrebutted and, contrary to National Fuel's argument,[18] provides unequivocal testimony regarding a release of hazardous substance at the Westwood Property during the term of National Fuel's ownership and operation.

Finally, the foregoing evidence is buttressed by recent deposition testimony given by Dr. Nakles, one of National Fuel's expert witnesses:

Q: What was done with the water from the tar separator at this [manufactured gas] plant?

. . . . .

Any time between 1898 and 1951[?]

A: Well, in the early years, there is no direct indication where the tar separator discharged to. My guess[19] is that it was sent to the creek, that would be the logical thing, and certainly in the later years we see the sewer lines and discharge lines tying the separators into the creek, so it would appear that for the majority of

18. See Item 186, p. 30 n. 21.

19. Dr. Nakles's use of the term "guess" does not undermine the quality of his testimony. Rather, as with all expert testimony, the court understands that Nakles was not merely "guessing," but was offering his expert opinion with a reasonable degree of scientific certainty.

it, it went to the creek, would be my guess.

Q: The water that you would find in the tar separator at this site that was ready to be discharged, would you expect that it contained dissolved contaminants associated with the tars?

A: Yes.

. . . . .

Now there were some variations on the separators used at this site, as you know through time, the use of coke breeze, for example, which they used later in the forties would decrease that by the nature of the absorption, but the solubility dictates what's in the water, yes.

Q: So ... we at least see the first evidence of drawing of discharge lines from the tar separators in the 1917 to 1919 time period; is that correct?

A: I believe that's correct.

Q: And certainly once that was there, it would be your expectation that the water phase from the tar separators was most likely discharged to the creek?

A: Yes, ... certainly these pipes indicate that there was some discharge to the creek, yes.

Q: And that water phase that was discharged, at least up till 1948 when the coke bed, the filter bed was installed, you would expect would contain tar related contaminants in a dissolved phase somewhere near the solubility limits of the various constituents; correct?

A: That's correct.

Q: So there would have been a contaminated water discharge from the tar separators when the plant was running between 1917 and 1948, at least?

A: Well, contaminated, again, I take a little bit issue with that, but it would be hydrocarbons, PAH's in dissolved form in that water, I would assume that it would have been throughout the whole operation of the plant, from 1898 on.

Item 194, Exh. A, pp. 45–47. National Fuel attempts to avoid the clear implications of its own expert's testimony by insisting (i) that National Fuel bears no successor liability as a result of People's ownership of the Westwood Property from 1901 to 1917; and (ii) there is no evidence to rebut National Fuel's theory that any releases from the actively operating Gas Plant would have occurred during BGC's operations. *See* Item 191, p. 15.

However, National Fuel cannot raise a question of fact simply by pegging all operational releases on BGC. People's was an "owner" under CERCLA and, as a result, National Fuel bears successor liability for the entire term of the Gas Plant's operations—including the operations of BGC.

In light of the foregoing discussion, Westwood has shown that National Fuel cannot maintain its third-party defense based on the theory that Westwood's 1985 construction activities was the sole cause for a release at or from the Westwood Property.

In summary, the court grants Westwood's motion for partial summary judgment and holds: (i) that National Fuel is liable for the *disposal* of hazardous waste at the Westwood Property—as that CERCLA facility has been defined in this order and opinion; (ii) that People's was an "owner" under CERCLA from 1901 to 1917; (iii) that National Fuel cannot maintain a third-party defense on the basis of BGC's operations from 1901 to 1917; and (iv) that National Fuel cannot maintain a

third-party defense on the basis of West-wood's 1985 construction activities.

### CONCLUSION

For all of the reasons discussed herein, the court grants National Fuel's motion for partial summary judgment (Item 175) and grants Westwood's motion for partial summary judgment as well (Item 179). In the end, both parties must bear liability for the contamination of the Westwood Property again, as that CERCLA facility has been more carefully defined by this order. *See supra* p. 19. As with all CERCLA litigation, the process of sorting out the parties' equitable share of the response costs is left to the allocation phase. Accordingly, the parties shall continue the ongoing process of allocation discovery. The court directs counsel to attend a status conference regarding the process of allocation discovery on Thursday, December 21, 2000, at 10:30 a.m.

So ordered.